30 F.3d 381
 UNITED STATES of America, Appellee,
v.
James NICOLAPOLOUS; Theodore Polatsidis; Fotis Halkis;
Dimitrios Velentzas; Stavros Orkopoulos;
Dimitrios Karytinos and Kostas
Giannikaris, Defendants,
Michael Grillo; Peter Drakoulis and Spyredon Velentzas,
Defendants-Appellants.
 Nos. 288, 585 and 586, Dockets 92-1634, 93-1117 and 93-1409.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1993.
Decided July 28, 1994.
 
 Andrew J. Weinstein, New York City (James M. LaRossa, Karen F. Silverman, LaRossa, Mitchell & Ross, of counsel), for defendant-appellant Velentzas.
 Roger J. Schwarz, New York City, for defendant-appellant Grillo.
 Peter Drakoulis, pro se.
 Kevin P. McGrath, Asst. U.S. Atty. (Zachary W. Carter, U.S. Atty., David C. James and Susan Corkery, Asst. U.S. Attys., E.D.N.Y., Brooklyn, NY, of counsel), for appellee.
 Before: FEINBERG, WINTER, and PRATT, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Spyredon Velentzas, Michael Grillo, and Peter Drakoulis appeal from their convictions by a jury before Judge Hurley. Velentzas, Grillo, and Drakoulis were convicted of RICO, RICO conspiracy, gambling, and loansharking offenses arising out of their operation of an illegal gambling enterprise. Each appellant raises a number of arguments, as well as incorporating the arguments of one another pursuant to Fed.R.App.P. 28(i). In a summary order filed this day, we explain our reasons for rejecting all but one argument advanced by appellants. In this opinion, we address Velentzas's contention, joined in by the other appellants, that the district court's order requiring only conditional disclosure of certain material ruled by the district court to be within the ambit of the Jencks Act, 18 U.S.C. Sec. 3500 (1988), requires the reversal of his conviction. For the reasons set forth below, we disagree because the district court's ruling was harmless. We therefore affirm.
 
 BACKGROUND
 
 2
 The appellants were charged in a twelve count indictment with, inter alia, RICO, RICO conspiracy, gambling, and loansharking offenses, arising from appellants' participation in a large criminal organization based in Astoria, Queens. Evidence introduced at trial, much of which was derived from a hidden microphone at the organization's headquarters, established that the organization operated illegal dice games, called "barbut," as well as illegal poker machines and horse betting parlors. The organization also engaged in the making and collecting of extortionate loans to players in these illegal games. The organization, which was headed by appellant Velentzas, was affiliated with the Luchese Crime Family.
 
 
 3
 At trial, Spyredon Fioravantes testified as one of the principal witnesses for the government. Fioravantes's testimony was relevant to most counts of the indictment against Velentzas, as well as the loansharking counts against Drakoulis. In essence, Fioravantes testified that he had operated illegal gambling and loansharking businesses in New York City, both in cooperation and in competition with Velentzas, for almost twenty years. During this time, Fioravantes acquired, and testified to, detailed firsthand knowledge of Velentzas and his associates' gambling and loansharking activities.
 
 
 4
 Fioravantes made no pretense of being a model citizen. In the course of his direct testimony, he admitted to having been engaged in criminal activities for virtually his entire life. He thus admitted to having been involved in drug dealing, loansharking and related assaults, tax evasion, illegally entering the United States, running illegal gambling establishments, and working closely with the Gambino Crime Family to enforce territorial restrictions on his competitors. Moreover, Fioravantes acknowledged that at the time of his testimony he was a state prisoner serving a lengthy state sentence for dealing heroin. Fioravantes also admitted that he committed perjury during his testimony at his state drug trial.
 
 
 5
 Fioravantes was cross-examined over the course of four days. During the cross-examination, Fioravantes admitted that he had up to $250,000 in illegal loans outstanding at various times. He also acknowledged that he had bribed policemen for years, and that Ralph Mosca, a Captain in the Gambino Crime Family, was his partner in several illegal barbut games. Velentzas's counsel specifically elicited Fioravantes's admission to participating in five separate beatings of delinquent debtors.
 
 
 6
 Fioravantes's cross-examination further revealed that he had kept a notebook in which he recorded, in Greek, the names, telephone numbers, and amounts outstanding for the recipients of his illegal loans. Fioravantes acknowledged that he had given the notebook to FBI agents who had debriefed him in connection with a criminal investigation of members of the Gambino Crime Family. The appellants' trial counsel immediately moved for the production of the notebook on the grounds that it constituted Jencks Act material, under 18 U.S.C. Sec. 3500 (1988).
 
 
 7
 Upon locating the notebook in question, the government provided it to the district court for an in camera review. See 18 U.S.C. Sec. 3500(c) (1988). The government, however, opposed production of the notebook to appellants on the grounds that the information in the notebook was cumulative in light of Fioravantes's admission of his loansharking, and that disclosure of the notebook threatened the safety and/or continued veracity of the individuals listed in it, who were potential witnesses in a separate, impending organized crime case.
 
 
 8
 Judge Hurley ruled that the notebook constituted Jencks Act material. In an attempt to accommodate the government's concerns, however, Judge Hurley preliminarily ordered that the notebook be disclosed to appellants' trial counsel, but, by way of protective order, also ordered that counsel were not to disclose the contents of the notebook to their clients.
 
 
 9
 Once the notebook had been translated into English, appellants' trial counsel renewed their objections to the district court's ruling, arguing that they needed to share the contents of the notebook with their clients in order to make meaningful use of the information. In response to Judge Hurley's expressed concern that allowing defense counsel access to the information without an opportunity to share it with their clients was "essentially a meaningless gesture," the government repeated its concerns over the safety of witnesses. The government further represented that appellants were not charged with loansharking in connection with any of the loans recorded in the notebook, nor, with one exception, were any of the individuals listed in the book alleged victims of appellants. The district court ruled that, because the notebook bore only on Fioravantes's credibility, none of the information in the notebook could be shared with appellants except for names contained in the notebook that Fioravantes had mentioned as debtors during his direct examination.
 
 
 10
 After Velentzas's counsel protested that, due to the frequent use of nicknames in the notebook, he could not tell who these individuals were without the aid of his client, Judge Hurley offered to have Fioravantes go through the notebook and indicate which persons he had mentioned in his testimony. Velentzas's counsel declined this invitation, and returned the notebook to the court. Drakoulis's counsel, however, used the notebook in cross-examining Fioravantes to illustrate that it did not contain his client's name.
 
 DISCUSSION
 
 11
 The Jencks Act, in relevant part, provides that:
 
 
 12
 [a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.
 
 
 13
 18 U.S.C. Sec. 3500(b) (1988). "[S]tatement" is defined in relevant part as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. Sec. 3500(e) (1988).
 
 
 14
 At trial, Judge Hurley ruled that the notebook in which Fioravantes kept records of his loansharking activities fell within the Jencks Act. In so ruling, Judge Hurley did not explicitly consider whether the notebook was a "statement" of the witness within the Act's definition, nor does the government seem to have argued that it was not a "statement." We have serious doubts whether the notebook, which was essentially a contemporaneous business record rather than a narrative composed in the course of responding to an investigation, was a "statement" as contemplated by the Jencks Act. However, we need not resolve this issue because it is clear that, even if the notebook was Jencks Act material, any loss of a more complete opportunity to impeach Fioravantes through use of the notebook with appellants' input was harmless error.
 
 
 15
 While the harmless error doctrine must be applied "strictly" in Jencks Act cases, Goldberg v. United States, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976), failure to disclose the withheld material must be deemed harmless where there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Petrillo, 821 F.2d 85, 89 (2d Cir.1987) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.)); see also United States v. Sperling, 726 F.2d 69, 73 (2d Cir.) (failure to disclose Jencks Act material harmless error), cert. denied, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); United States v. Mourad, 729 F.2d 195, 199-200 (2d Cir.) (same), cert. denied, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), and cert. denied, 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985); cf. United States v. Truong Dinh Hung, 667 F.2d 1105, 1108 (4th Cir.1981) (failure to allow defendants to aid their attorneys in inspecting alleged Jencks Act material harmless error), cert. denied, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). A "reasonable probability," in this context, means "a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)).
 
 
 16
 We perceive no prejudice suffered by appellants as a result of their lack of unconditional access to the notebook. The government represented that the loans recorded in the notebook bore no relevance to the charges in this case. After reviewing the notebook in camera, Judge Hurley concluded that it was useful to the defense only insofar as it furthered the impeachment of Fioravantes. However, the material already available to the defense to impeach Fioravantes's credibility, including evidence of his loansharking, was abundant to say the least.
 
 
 17
 Moreover, there appears to be no non-cumulative use that appellants could have made of the notebook in attacking Fioravantes's credibility. Fioravantes admitted to extensive loansharking activity as well as other criminal activity. Rule 608(b) of the Federal Rules of Evidence bars the introduction of extrinsic evidence of specific instances of past misconduct to attack the credibility of a witness but gives the judge discretion to permit inquiry into such matters during cross-examination.[1] See Chnapkova v. Koh, 985 F.2d 79, 82 (2d Cir.1993). Judge Hurley allowed Velentzas's counsel to ask Fioravantes about five separate instances of his loansharking and its attendant assaults. In the course of colloquy over the production of the notebook, Judge Hurley advised defense counsel that he believed this area had been fully explored through cross-examination and that he would not permit the defense to present extrinsic evidence of Fioravantes's loansharking by calling the debtors listed in the notebook as witnesses.
 
 
 18
 Appellants argue, however, that, because they still have not had an opportunity to fully share the notebook's contents with their clients, they cannot say how they would have used the notebook at trial. Although we acknowledge the premise of appellants' arguments, we are unpersuaded of their conclusion. Appellants have failed to suggest how the material might conceivably have aided them beyond providing virtually irrelevant details of loansharking that Fioravantes freely admitted to at trial. Further, our independent examination of the withheld material persuades us that it does not bear any apparent usefulness beyond substantiating the existence of loansharking, which Fioravantes admitted.
 
 
 19
 Finally, Fioravantes's testimony was not the only evidence showing the appellants' commission of the crimes of which they were convicted. See Petrillo, 821 F.2d at 90 (distinguishing cases finding that withheld impeachment evidence prejudiced defense on grounds that in those cases "witness whose credibility was at issue supplied the only evidence linking the defendant(s) to the crime"). In fact, the jury heard tape recordings of Velentzas, Drakoulis, Grillo, and others discussing their gambling and loansharking activities.
 
 
 20
 The judgments of conviction are therefore affirmed.
 
 
 
 [1]
 Rule 608(b), in relevant part, provides that:
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....
 Fed.R.Evid. 608(b).