**UNITED STATES of America,**
**Appellee,**

v.

**Sharon JACKSON; Anthony Mazyck,**
**also known as Tony, Defendants–**
**Appellants.**

**Docket Nos. 02–1237, 02–1238.**

United States Court of Appeals,
Second Circuit.

Argued:  Jan. 31, 2003.

Decided:  Sept. 17, 2003.

Larry Sheehan, Scarsdale, NY, for Appellant Sharon Jackson.

Theodore S. Green, White Plains, NY, for Appellant Anthony Mazyck.

Christopher P. Conniff, Assistant United States Attorney, New York, NY (James B. Comey, United States Attorney, and Andrew J. Ceresney, Assistant United States Attorney, on the brief), for Appellee.

Before: JACOBS, CALABRESI, and SOTOMAYOR, Circuit Judges.

JACOBS, Circuit Judge.

Sharon Jackson and Anthony Mazyck appeal from judgments of conviction entered against them on April 4, 2002 after a jury trial in the United States District Court for the Southern District of New York (Brieant, *J.*). Jackson was convicted on three counts—and Mazyck on one count—of possession with intent to distribute, and distribution of, crack cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) and 18 U.S.C. § 2. On appeal, they argue that (1) there was insufficient evidence to prove beyond a reasonable doubt that they sold crack cocaine (as opposed to powder cocaine in a rock-like form) or to authenticate the substance introduced at trial as the substance they sold; (2) the government failed to disprove entrapment beyond a reasonable doubt; and (3) the government failed to disclose certain information concerning its confidential informant.

## BACKGROUND

In October 2000, the Drug Enforcement Agency ("DEA") commenced an investigation of drug trafficking in Spring Valley, New York. The DEA leased an apartment at 94 Bethune Boulevard for a paid informant, William Redman. The DEA installed a hidden videotaping device in the living room, which agents could monitor from a remote location. Redman moved into the apartment, assumed a false name, and posed as a small businessman who sold clothing and videotapes.

Redman quickly became acquainted with his downstairs neighbor, defendant-appellant Sharon Jackson. He discussed personal and family problems with her and gave her clothing, videos, cigarettes, and beer. Within a few weeks, he told her that he was a user of crack cocaine and that he was having difficulty obtaining it in the area. Redman then asked Jackson to obtain drugs for him. According to Jackson, she refused his requests seven or eight times. She ultimately acquiesced, however, because, as a drug addict herself, she felt sorry for Redman and did not want others taking advantage of him.

Over the next three months, Jackson sold Redman small amounts of powder and crack cocaine on several occasions. Each time, the transaction followed the same pattern: prior to the sale, Redman would meet with DEA agents at a prearranged location; the agents would provide him with the requested amount of money; he would return to his apartment and wait for Jackson; when she arrived, he would purchase the drugs while agents monitored the room's video or audio signal; and then Redman would meet the agents to turn over the drugs and any unused currency.

As the weeks passed, Redman requested larger quantities of drugs from Jackson, ostensibly to take them to Virginia and resell them at a profit. Jackson asked her boyfriend, defendant-appellant Anthony Mazyck, to obtain drugs for Redman. On December 13, 2000, Mazyck and Jackson

came to the apartment and sold Redman 21.3 grams of cocaine. Jackson and Mazyck claim that it was powder cocaine in a rock-like form, but the government contended—and persuaded the jury—that it was actually crack cocaine. Redman purchased these drugs with $1,100 of DEA money and returned $60 in change to the agents. Jackson also sold Redman smaller amounts of crack cocaine on January 12, 2001 and February 8, 2001.

On July 6, 2001, the government indicted Jackson on two counts of possession and distribution of crack cocaine. On July 18, 2001, prosecutors filed a superseding indictment. Count One charged both Jackson and Mazyck with distributing and possessing with intent to distribute approximately 21.3 grams of crack cocaine on December 13, 2000, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) and 18 U.S.C. § 2. Counts Two and Three charged Jackson under the same statutes for distributing and possessing with intent to distribute approximately 9.7 grams of crack cocaine on January 12, 2001 and approximately 10.1 grams of crack cocaine on February 8, 2001.[1]

The case proceeded to a jury trial on December 17, 2001. The government introduced into evidence videotapes of the December 13 and February 8 transactions, an audiotape of the January 12 transaction, and testimony by four DEA agents who surveilled the transactions and supervised Redman. Redman himself died of natural causes before trial and therefore did not testify.

On December 20, 2001, the jury convicted the defendants on all counts. The jury also made specific findings on drug quantity, finding beyond a reasonable doubt that (a) the December 13 transaction involved 21.3 grams of substances containing co-

caine base; (b) the January 12 transaction involved 9.7 grams of substances containing cocaine base; and (c) the February 8 transaction involved 10.1 grams of substances containing cocaine base.

On April 4, 2002, the district court (Brieant, *J.*) sentenced Jackson to 97 months of imprisonment, four years of supervised release, and a $300 special assessment. On the same day, the district court sentenced Mazyck to 120 months of imprisonment, eight years of supervised release, and a $100 special assessment. Jackson and Mazyck are currently serving their prison terms.

## DISCUSSION

Jackson and Mazyck challenge their convictions on the basis of evidentiary issues, an entrapment defense, and the government's nondisclosure of certain materials concerning its confidential informant.

### I. Evidentiary Issues

As to the evidentiary claims regarding the substance sold by Jackson and Mazyck on December 13, 2000, it is conceded that the drugs were admitted into evidence without objection. (Appellee's Br. at 17; Jackson Br. at 19.) Appellants therefore waived their authentication challenge. *Cf. United States v. Gelzer*, 50 F.3d 1133, 1141 (2d Cir.1995) (affirming district court's ruling that "any objection based on the chain of custody was waived when defense counsel failed to challenge the introduction into evidence of the revolver and the ballistics report"); Fed.R.Evid. 103(a)(1) (providing that "[e]rror may not be predicated upon a ruling which admits ... evidence unless ... a timely objection or motion to strike appears of record, stating the specific

---

**1.** Prior to trial, the district court dismissed a fourth count, which charged Jackson and Ma-

zyck with conspiracy to possess and distribute crack cocaine.

ground of objection, if the specific ground was not apparent from the context").

■ Absent a timely objection to the authentication of the drugs, we review the admission of this evidence only for plain error. Thus, the appellants may obtain relief only if there was (1) error; (2) that is plain; (3) that affects substantial rights; and (4) that affects seriously the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations omitted); *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed.R.Crim.P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

■ We find no plain error because there was a sufficient basis to find in favor of the drugs' authenticity. Under Rule 901 of the Federal Rules of Evidence, "[t]he requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a); *see also United States v. Dhinsa,* 243 F.3d 635, 658 (2d Cir.2001), *cert. denied,* 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001). The government established a chain of custody consisting of (i) a videotape that showed Mazyck giving the substance to Redman; (ii) a DEA agent's testimony regarding the government's surveillance of Redman for most of the time before, during, and after the videotaped transaction; (iii) an agent's testimony regarding the DEA's field-testing and storage of the drugs; and (iv) the testimony of the forensic chemist who subjected the substance to laboratory testing.

Jackson and Mazyck argue that this chain of custody fails to account for Redman's brief absence from the video camera's field of view. They also argue that the authenticity of the substance introduced at trial is undermined by the fact that Redman delivered four rocks to the DEA, whereas the video showed Mazyck counting and giving five rocks to Redman. They argue that the $60 in change Redman returned to the DEA could not have come from the December 13 transaction, since the video did not show Mazyck giving the informant any change at all.

While these factors cast some doubt on the chain of custody, we cannot say that they made the admission of the drugs plain error. The government need not "rule out all possibilities inconsistent with authenticity, or ... prove beyond any doubt that the evidence is what it purports to be." *Dhinsa,* 243 F.3d at 658 (quoting *United States v. Pluta,* 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks omitted)). "Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence ...." *United States v. Morrison,* 153 F.3d 34, 57 (2d Cir.1998).

■ For similar reasons, we also reject the defendants' claim that the evidence was insufficient to prove that they sold Redman crack cocaine, as opposed to a rock-like form of powder cocaine. When reviewing a challenge to the sufficiency of evidence, this Court "view[s] the evidence in the light most favorable to the government, ... construe[s] all permissible inferences in its favor, resolve[s] all issues of credibility in favor of the jury's verdict, and uphold[s] a conviction if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998) (citations, internal quotation marks, and alterations omitted). Notwithstanding the apparent deficit of one rock and the dis-

pute over the amount of unused currency delivered to the government by Redman, the jury could reasonably infer that Jackson and Mazyck sold Redman crack cocaine based on the agents' testimony, the taped conversations and transactions, the expert analysis of the drugs obtained by Redman, and the defendants' own testimony.[2] *See United States v. Roldan–Zapata,* 916 F.2d 795, 802 (2d Cir.1990) ("The jury is entitled to base its verdict upon inferences from circumstantial evidence and such evidence need not have excluded every possible hypothesis of innocence.") (citations and internal quotation marks omitted). The jury could reasonably believe that Redman, while off camera, stashed one rock in a drawer for future use, and convict the defendants nonetheless.

## II. Entrapment

■ Jackson and Mazyck do not challenge the district court's entrapment charge, but rather argue that there was insufficient evidence to support the jury's conclusion that they were not entrapped. To establish the affirmative defense of entrapment, a defendant must show two factors by a preponderance of the evidence: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." *United States v. Bala,* 236 F.3d 87, 94 (2d Cir.2000) (citation omitted). The government's informant befriended Jackson, gave her clothes, and beseeched her on numerous occasions to obtain drugs for him; this was sufficient to establish

"credible evidence of government inducement."[3] *Id.* It thus fell to "the prosecutor [to] show predisposition beyond a reasonable doubt." *Id.* In reviewing a challenge to the sufficiency of the government's evidence of predisposition, we apply the same rigorous standard applicable to other sufficiency claims. *See id.* at 93–94; *see also supra* Part I.

■ The government's evidence of predisposition was sufficient. First, "the [g]overnment is entitled to show by a pattern of episodes that there was not only predisposition but determination to commit the charged offenses." *United States v. Roland,* 748 F.2d 1321, 1326 (2d Cir.1984). Jackson engaged in a series of drug transactions with the informant over a period of several months. Second, defendants' "knowledge of the quality and price of the cocaine might lead a jury to believe that [they] were somewhat experienced with cocaine transactions." *United States v. Valencia,* 645 F.2d 1158, 1167 (2d Cir. 1980). The videotapes and audiotapes revealed that Jackson and Mazyck demonstrated familiarity with the terminology and operations of the drug trade. Finally, an entrapment defense may be precluded when "there [is] ample proof that [the defendant] had been involved in drug dealing prior to any involvement with a government agent or informant." *United States v. Hurtado,* 47 F.3d 577, 585 (2d Cir.1995). There was evidence Mazyck pleaded guilty to criminal possession of

---

**2.** As with the authentication claim, the government contends that the defendants waived their sufficiency claim by failing to make a motion challenging the drug evidence in the district court. (Appellee's Br. at 24.) Our conclusion that the evidence was sufficient precludes a finding of plain error and obviates any need to determine whether the defendants properly preserved their sufficiency claim for appellate review.

**3.** The district court stated that it was "very doubtful as to whether this record arises even to the level of letting you go to the jury on entrapment, but . . . I think there are prudential reasons for leaving it with the jury, and I propose to do that." (Tr. of Jury Trial, dated Dec. 19, 2001, at 273.)

crack cocaine in state court in 1991,[4] and there was evidence Jackson herself had a drug addiction.

While Jackson testified that she refused the informant's importuning seven or eight times, "the jury was entitled to discredit" her testimony that "she resisted the idea [of selling cocaine] for some time." *Valencia*, 645 F.2d at 1168. Even if she did resist, she may have done so simply because she did not yet know or trust the informant. *Cf. Bala*, 236 F.3d at 94 (observing that "what the defendant interprets as his reluctance the jury could interpret as ... holding out for more money"). Moreover, the jury could have concluded from viewing and listening to the recorded transactions that Jackson and Mazyck ultimately demonstrated no reluctance or hesitation at all.

■ To the extent that Jackson and Mazyck claim a violation of due process, that claim fails as well. Jackson testified that the government's informant asked her to sell him drugs numerous times, even begged her, and that he plied her with clothing and the use of his car. However, there was no evidence that the government engaged in "the type of coercive action or outrageous violation of physical integrity or other egregious or outrageous government conduct" that might independently violate the Due Process Clause. *United States v. Dyman*, 739 F.2d 762, 769 (2d Cir.1984) (citations omitted) (collecting cases); *see also United States v. Duggan*, 743 F.2d 59, 84 (2d Cir.1984) (noting that this Court has "rarely sustained due process claims concerning government investigative conduct, stressing that the conduct involved must be 'most egregious' ... and 'so repugnant and excessive' as to shock the conscience") (citations omitted).

## III.  Disclosure

During pretrial proceedings, Jackson and Mazyck sought disclosure concerning the government's confidential informant— whose real identity they did not then know—including his name, date of birth, social security number, address, and criminal history, as well as the DEA's internal informant file and debriefing reports pertaining to him. (*See* Affirmation & Memo in Support of Def.'s Motion, dated Sept. 2, 2001, at 2–5.) They also sought, more broadly, "all exculpatory evidence within [the government's] possession," pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Notice of Motion, dated Sept. 2, 2001, at 1.) In opposition, the government argued that it had no disclosure obligation because the informant, having died, would not testify. (Tr. of Pretrial Hearing, dated Oct. 15, 2001, at 4–5.)

After a hearing, the district court "urg[ed]" the government to disclose limited information about the informant, without ruling on any obligation to do so. (*Id.* at 9, 15.) The government disclosed Redman's name, his criminal history, his social security number, his date of birth, and the DEA deactivation report that noted his death and summarized the DEA's history of payments to him. (Appellee's Br. at 38; Letter of Ass't United States Att'y Christopher P. Conniff, dated Dec. 12, 2001, at 1.) During trial, the government also disclosed reports prepared by two testifying DEA agents after the relevant drug transactions.

However, the government did not disclose its entire file on Redman. It came to light on appeal that the government pos-

---

4.  Mazyck contends that he was innocent of the 1991 crime and pleaded guilty because prosecutors rushed him to trial, but a jury could reasonably choose to discredit that testimony.

sessed statements by Redman summarizing his interactions with the defendants, statements that Redman's DEA handlers transcribed and that Redman signed and initialed as his own. The government also possessed a report that referenced a termination of Redman's services many years earlier by the DEA.

On appeal, Jackson and Mazyck argue that their convictions must be reversed because the government failed to satisfy its disclosure obligations with regard to its confidential informant. Although Redman never testified, Jackson and Mazyck argue that the government's other evidence—videotapes, audiotapes, and DEA agent testimony—inserted his hearsay statements into evidence and therefore entitled them to discovery of exculpatory and impeachment materials pertaining to him. We consider each of the possible bases for such disclosure and conclude that there was no reversible error.

## A. Issue Preservation

The government argues at the threshold that Jackson and Mazyck waived their claim for disclosure of Redman's written statements and the other impeachment materials sought in pretrial discovery by failing to challenge their nondisclosure after the government introduced tapes of the transactions with Redman and adduced testimony by a DEA agent that "Redman provided a statement following the December 13 transaction." (Appellee's Br. at 40.) The government relies principally on two Seventh Circuit cases, *United States v. Johnson*, 200 F.3d 529 (7th Cir.2000), and *United States v. Knapp*, 25 F.3d 451 (7th Cir.1994), for the general proposition that a defendant must renew a disclosure request at trial if and when he learns about the existence of undisclosed materials.

Both *Johnson* and *Knapp* involved waiver of a claim for disclosure of a witness's prior statements under the Jencks Act, 18 U.S.C. § 3500. In *Johnson*, the court held that the defendant waived his claim for disclosure of a witness's prior statements because, although "he initially requested Jencks documents, [he] never pursued this request after he learned at trial about the alleged statements" that should have been disclosed. *Johnson*, 200 F.3d at 536. Similarly, *Knapp* held that the defendant had waived his disclosure claim because he "did not request [the report in question] at trial following [the witness's] testimony," even though he "was aware that access to [the report] was specifically denied to him by the government prior to trial." *Knapp*, 25 F.3d at 460.

■ These cases are inapposite for two reasons. First, Jackson and Mazyck neither knew nor had reason to believe that Redman's written statements existed. The DEA agent who testified for the government stated only that he had taken "a statement" from Redman, not that he had transcribed a verbatim written statement. (Mazyck Reply Br. at 2; Tr. of Jury Trial, dated Dec. 17, 2001, at 32.) Jackson and Mazyck learned for the first time on appeal that the government possessed written statements attributed to Redman. Nothing that occurred during trial put them on notice that the government possessed undisclosed Jencks Act material.

■ Second, *Johnson* and *Knapp* dealt only with the Jencks Act, whereas Jackson and Mazyck also invoke the due process disclosure principles embodied in *Brady* and its progeny. We have observed that "a prosecutor's *Brady* obligation is independent of a defendant's request for *Brady* materials." *In re United States (United States v. Coppa)*, 267 F.3d 132, 144 (2d Cir.2001). "[R]egardless of a defendant's request, the government violates its duties under *Brady* if it suppresses evidence that, if disclosed, would have had a reasonable

probability of changing the outcome of the proceedings." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 681–82, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). We decline to hold that Jackson and Mazyck waived a disclosure claim grounded in due process by failing to renew a pretrial request for specific materials the existence of which, even at trial, they had no reason to suspect.[5]

The government also presses a more specific waiver argument. As developed in Parts III.C and III.D below, the fact that Redman died before trial presents certain obstacles to the defendants' disclosure claims. To overcome these hurdles, the defendants seek to rely in part on Rule 806 of the Federal Rules of Evidence, which permits the impeachment of hearsay declarants who do not testify. *See* Fed. R.Evid. 806. The government contends that Jackson and Mazyck raised this claim for the first time on appeal and failed to present it to the district court for its consideration. (Appellee's Br. at 42.)

The record does not support the government's position. During the pretrial hearing on disclosure, Mazyck's attorney presented the following argument to the district court (as abstracted from a lengthy colloquy):

> [W]ith the informant unavailable, the government will have to attempt to establish some type of a chain of custody for the controlled substance ... that was sold.... [T]he veracity or the reliability of the informant ... is relevant, even if it's unavailable. For example, we have Rule 806.... It puts the credibility of the informant in issue ... as to whether or not he gave the agents whatever substance he claims.... Basically, I was making a *Giglio* motion.

(Tr. of Pretrial Hearing, dated Oct. 15, 2001, at 13–15; *see also* Mazyck Reply Br. at 3–4.) Although defense counsel could have been more precise in identifying the evidence that would incorporate Redman's hearsay declarations, his argument afforded the court sufficient notice that the disclosure claim relied in part on Rule 806. We conclude that the disclosure claims were not forfeited, and we consider their merits.

## B. *Roviaro*

The government generally enjoys a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). However, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," the "fundamental requirements of fairness" require that "the privilege must give way."

---

**5.** Neither Jackson nor Mazyck cite or discuss *Brady* in their briefs on appeal. Jackson focuses exclusively on the disclosure obligations created by *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Mazyck focuses on the Jencks Act, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Fed.R.Evid. 806. At oral argument, Mazyck's attorney mentioned *Brady* only in passing. We could therefore deem the *Brady* claim to have been abandoned. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir.1995) (explaining that issue not raised by appellant in appellate brief is abandoned); Fed. R.App. P. 28(a) (setting out requirements for appellant's brief). We decline to do so, however, because *Giglio* and *Brady* are closely intertwined and differ chiefly as to the general purpose of the evidence favorable to the accused (exculpatory or impeachment). *See In re United States*, 267 F.3d at 142. Mazyck's arguments on the value of Redman's statements bear as much on their exculpatory nature as on their impeachment value.

*Id.* at 60–61, 77 S.Ct. 623. There is "no fixed rule with respect to [such] disclosure." *Id.* at 62, 77 S.Ct. 623. Rather, the court must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense," based on "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* If this balancing favors the defendant, then he is entitled to learn the identity of the government's informant.

■ The information provided to the defendants before trial at the district court's urging satisfied *Roviaro.* The government disclosed Redman's name, social security number, and criminal record. As this Court has explained, *Roviaro* requires no more than disclosure of the informant's identity:

> Although the *Roviaro* Court included the words "or the contents of his communication" in a sentence discussing the limits of the informant's privilege, the Court did not address this issue.... [W]e have found [no case] holding that this language in *Roviaro* provides defendants with a generalized affirmative right, independent of the Government's obligations under the Jencks Act, 18 U.S.C. § 3500, and under *Brady v. Maryland,* to obtain statements of non-witnesses merely because they happen to be informants.

*United States v. Saa,* 859 F.2d 1067, 1075 n. 3 (2d Cir.1988) (citations omitted). Jackson and Mazyck must therefore look to other disclosure doctrines for authority to support disclosure beyond Redman's identity.

### C. *Brady/Giglio*

■ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *In re United States,* 267 F.3d at 139; *see also Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *In re United States,* 267 F.3d at 139; *see also Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

The fact that Redman did not testify at the defendants' trial presents no obstacle to application of *Brady* and its progeny. Although we have never expressly stated that the government must disclose exculpatory and impeachment materials pertaining to nontestifying witnesses, that conclusion flows ineluctably from our prior cases. In *Leka v. Portuondo,* 257 F.3d 89 (2d Cir.2001), for example, we found a *Brady* violation—and granted habeas relief—based on a prosecutor's failure to disclose exculpatory information from a police officer who did not testify at the defendant's trial. *Id.* at 102–03, 106. The officer's observations of the crime scene "were favorable to the defense" and contradicted the observations of two eyewitnesses who testified for the prosecution. *Id.* at 99.

We considered a similar situation in *United States v. Orena,* 145 F.3d 551 (2d Cir.1998), where "[t]he district court granted [the defendants'] motions for a new trial on the basis that the government violated its *Brady* obligations by failing to disclose information that defendants could have used to impeach the credibility of out-

of-court statements made by [a] co-conspirator ... that were admitted at trial under Fed.R.Evid. 801(d)(2)(E)." *Id.* at 553 (citation omitted). The undisclosed evidence was the status of an out-of-court declarant as a government informant, as well as several internal FBI documents reflecting that the declarant had lied about other murders and his role in them. We "reverse[d] so much of the order as granted [the defendants'] motions for a new trial" only because "the impeachment evidence withheld by the government [did] not meet the *Brady* standard of 'materiality.'" *Id.*

In *Orena* and *Leka*, we did not question *Brady*'s applicability to disclosure concerning out-of-court declarants. Instead, we focused our attention on whether the defendant had established a *Brady* violation. It is thus clear that *Brady* and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant. A contrary conclusion would permit the government to avoid disclosure of exculpatory

or impeachment material simply by not calling the relevant witness to testify.[6]

Thus, as in *Orena* and *Leka*, we focus our analysis on the merits of the defendants' *Brady* claim. "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). We consider each component in turn.

### 1. Evidence Favorable to the Accused

Evidence is favorable to the accused if it either "tends to show that the accused is not guilty" or "impeaches a government witness." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir.2002). The government's undisclosed materials concerning Redman were incrementally favorable to the defense in several ways. First, as

**6.** Two circuit court decisions could be read to hold that *Giglio*, unlike *Brady*, applies only to government witnesses who testify because it deals specifically with impeachment material. *See United States v. Green*, 178 F.3d 1099, 1109 (10th Cir.1999) (holding that *Giglio* did not apply when the government "did not ever call" its confidential informant as a witness); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir.1994) (finding "no authority that the government must disclose promises of immunity made to individuals the government does not have testify at trial," and holding that a grant of immunity could not be " 'favorable to the accused' as impeachment evidence because the government did not call [the witness] and, thus, there was no one to impeach").

We decline to draw a blanket distinction between *Brady* and *Giglio* claims on the basis of whether the witness testifies. As noted above, *Orena* involved "information that de-

fendants could have used to *impeach* the credibility of out-of-court statements made by [a] co-conspirator ... that were admitted at trial under Fed.R.Evid. 801(d)(2)(E)." 145 F.3d at 553 (emphasis added). In *United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir.1996), similarly, the D.C. Circuit cited *Giglio* and considered whether information was either exculpatory or impeachment material after observing that, "[i]f a declarant contradicted himself on a key point, then *Brady v. Maryland* would likely require disclosure." *Id.* at 513–14.

Of course, if the undisclosed information is relevant only to the credibility of a nontestifying witness or declarant, that will bear upon the materiality of the information. *See Orena*, 145 F.3d at 553 (reversing "so much of the order as granted [the defendants'] motions for a new trial" because "the impeachment evidence withheld by the government [did] not meet the *Brady* standard of 'materiality' ").

Mazyck notes in a post-briefing submission, Redman's December 13 statement was "at odds" with a previously disclosed DEA debriefing report and the videotape of the December 13 transaction. (Reply Aff. of Theodore Green, dated Nov. 6, 2002, at 3.)[7] The DEA report, dated December 14, 2000, recounted a debriefing from December 13:

> The [informant] reported that on the previous night [December 12], he/she was approached by his/her neighbor, Sharon Jackson, ... and she showed him/her a large crack cocaine rock. Jackson stated that the crack belonged to her boyfriend and that he would sell the [informant] the rock for $1000.00. Later that night, the [informant] telephoned Jackson to arrange to purchase the crack the following day. At that time, Jackson told the [informant] to come to her apartment and weigh the crack. A short time later, ... the [informant] weighed the crack out to approximately 30 grams and asked Mazyck if he would sell it for $1000.00. At this point, Mazyck took the rock, broke off a piece, gave the [informant] the larger piece, and told him/her to weigh that. The [informant] weighed that portion out to approximately 22 grams. Mazyck told the [informant] that he/she could purchase that piece for $1000.00. The [informant] agreed and coordinated a meet time for the following afternoon [December 13] to complete the deal.

(Gov't Exh. 3501–J, Report of Investigation, dated Dec. 14, 2000, at 1.) Redman's statement refers to the evening of December 12, but references no meeting with Mazyck at that time:

> On 12–12–2000 I spoke to Sharon Jackson my neighbor about getting some crack for 12–13–2000[,] about one thousand dollars worth of crack. Later that evening (12–12–2000) Sharon told me that she could get the crack I wanted and could do the deal on 12–13–2000 between 1 and 2 o'clock in the afternoon.

(Redman Statement, dated Dec. 13, 2000, at 1.) Redman also stated that the price negotiation occurred at the time of sale on December 13, and that he and Mazyck agreed on a price of $1,040. (*Id.* at 2.) As defense counsel points out, the videotaped transaction does not appear to include any negotiation. (Reply Aff. of Theodore Green, dated Nov. 6, 2002, at 4.)

Moreover, Redman's account states that he gave Mazyck $1,040 (Redman Statement, dated Dec. 13, 2000, at 2), but the DEA provided Redman with $1,100 in buy money, in the form of twenty-two $50 bills. The videotape shows Mazyck counting twenty bills of indeterminate denomination and giving Redman no change. It is therefore unclear how Redman obtained the $60 in purportedly unused currency—one of the government's marked $50 bills, plus a $10 bill—that he returned to the DEA after the December 13 transaction.

---

7. Once alerted to the existence of the previously undisclosed Redman materials, Mazyck filed a motion for their disclosure in this Court. The government voluntarily disclosed Redman's written statements and, at our instruction, filed additional materials under seal. In a reply affirmation, Mazyck's attorney asked for "an opportunity to make supplemental arguments from [Redman's statements] either by way of a supplemental brief or, in the alternative, by having this Court consider the points raised in this reply." (Reply Aff. of Theodore Green, dated Nov. 6, 2002, at 6.)

Mazyck's motion to place before us the additional arguments stated in the reply affirmation is granted, but the motion is denied to the extent that it seeks permission to file a supplemental brief. Since the government has now submitted all of its materials pertaining to Redman, and since we have reviewed those materials in full, we also deny as moot Mazyck's motion for additional disclosure.

The defendants argue that these inconsistencies, "in combination with other evidence adduced at trial, ... would have undermined a critical element of the government's case—mainly, whether the drugs offered into evidence by the government were in fact the drugs that Mazyck sold." (Reply Aff. of Theodore Green, dated Nov. 6, 2002, at 5.) They argue that "Redman's inability to give a consistent account of how and when he supposedly negotiated a $1000 sale would have supported the defense theory that Redman misrepresented to the agents the true purchase price and supported Mazyck's testimony that what was actually sold was not crack but $400 worth of ordinary cocaine." (*Id.*) There is another disconnect: in an account of his earlier dealings with Jackson, Redman stated that Jackson told him "her 'old man' [presumably, Mazyck] would sell [him] *powder* if [Redman] needed it." (Redman Statement, dated Nov. 17, 2000, at 1 (emphasis added).)

Our own review of the undisclosed materials also reveals information that the defendants might have been able to use to impeach Redman's credibility, including a sealed document that references the termination of Redman's services many years earlier for a (non-drug related) offense. Inasmuch as this information suggests that the DEA once deemed Redman unsatisfactory as an informant, it could be used to undermine his credibility as an informant in the investigation that led to Jackson and Mazyck's arrests. The undisclosed Redman materials therefore satisfy the first component of a *Brady* claim.

### 2. Suppression by the Government

▇▇▇▇ Jackson and Mazyck's claim also satisfies the second component of the Supreme Court's test for a *Brady* violation: failure to disclose the favorable information. Under *Brady*, "[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation," and "the prosecutor's good faith or lack of bad faith is irrelevant." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (citing *Kyles v. Whitley*, 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *see also Giglio*, 405 U.S. at 154, 92 S.Ct. 763. The written statements obtained from Redman and the DEA report fall within this category, whether or not the Assistant United States Attorney who prosecuted Jackson and Mazyck was actually aware of their existence prior to trial. We recognize an exception to the disclosure obligation where "the defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence,'" *Payne*, 63 F.3d at 1208 (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993)), but there is no apparent basis for concluding that Jackson and Mazyck knew or should have known about these materials or their contents.

### 3. Materiality

▇▇▇▇ Jackson and Mazyck's *Brady* claim fails to satisfy the third component of the Supreme Court's test for a *Brady* violation. This component requires us to ask "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry." *Strickler*, 527 U.S. at 282, 119 S.Ct. 1936. The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. This is not a test for sufficiency of evidence; the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 434–35, 115 S.Ct. 1555; *see also In re United States*, 267 F.3d at 141–44 (discussing evolution of the materiality component

of *Brady/Giglio* claims). We look at "the cumulative effect of suppression" in light of the evidence as a whole, *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555, and we conduct our "own independent examination of the record in determining whether the suppressed evidence is material." *Orena,* 145 F.3d at 558.

"[A] new trial is generally not required when the testimony of the witness is 'corroborated by other testimony' or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Payne,* 63 F.3d at 1210 (citations omitted); *see also Gil,* 297 F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."); *Orena,* 145 F.3d at 558; *cf. Leka,* 257 F.3d at 104 ("[W]hen a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted.").

In *Payne,* this Court held that the undisclosed evidence was immaterial because it related to testimony that constituted "but a fraction of the evidence linking [the defendant] to narcotics dealing." 63 F.3d at 1210. That testimony was corroborated by other eyewitness testimony and by "strong physical evidence of [the defendant's] involvement in the December 18 sale, including the crack itself," as well as a photograph and incriminating recorded conversations involving the defendant. *Id.* at 1210–11. In *Orena,* similarly, this Court held that the undisclosed evidence was immaterial because there was substantial independent evidence of the defendants' guilt, including telephone records and other witnesses' testimony that implicated the defendants in the murder conspiracy. The *Orena* defendants also possessed and used strong impeachment evidence separate and apart from the undisclosed information. 145 F.3d at 558–59.

In *Leka,* by contrast, we held that the undisclosed evidence—a police officer's eyewitness observations—was material because it contradicted the accounts of two eyewitnesses whose testimony constituted the "sole evidence at trial connecting [the defendant] to the shooting." 257 F.3d at 104. We noted that it was "likely that [the officer's] testimony at trial would have had seismic impact, both because of what he would have said and because his testimony would have furnished the defense with promising lines of inquiry for the cross-examination of [the two witnesses]." *Id.* at 106. We held that, "[i]n light of the substance of [the officer's] testimony, the credibility of a former police officer appearing as a defense witness, and the fact that the jury was at one point hung, it is easy to conclude that 'the government's evidentiary suppression undermine[d] confidence in the outcome of [the] trial.'" *Id.* at 107 (quoting *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555).

The present case is more similar to *Payne* and *Orena* than to *Leka.* The jury's verdict was supported by compelling evidence, including repeated drug transactions caught on videotape. Moreover, the undisclosed materials were of limited utility; there is no reasonable probability that there would have been a different result if they had been in the defendants' hands at trial. First, the inconsistencies between Redman's account of the December 13 transaction and the DEA agent's report were minor. Redman stated that, on December 12, he "spoke to Sharon Jackson ... about getting some crack for 12–13–2000[,] about one thousand dollars worth of crack. Later that evening ... Sharon told [him] that she could get the crack [he] wanted and could do the deal on 12–13–

2000 between 1 and 2 o'clock in the afternoon." (Redman Statement, dated Dec. 13, 2000, at 1.) The agent's report differs chiefly by being more complete and detailed. We see no reasonable probability that the jury would acquit simply because a DEA agent included more information in an investigation report than was transcribed as part of Redman's statement.

As to the price of the drugs and the unused funds: the December 13 video does not show Mazyck giving change, but that does not foreclose the possibility that he did so silently outside the camera's field of view. Even if Mazyck gave Redman no change, that fact would not undermine the devastating impact of the videotaped transaction. Redman may have purchased the crack cocaine for $1,000, returned $60 to the government, and pocketed one of the government's $50 bills for a $40 profit. The fact that Redman may have been skimming does not raise a reasonable probability of a different outcome.

More to the point, the defendants were able to argue at trial that Redman was an unreliable middleman even without the undisclosed materials. That was the main thrust of Mazyck's defense. Defense counsel emphasized to the jury that the $60 in change Redman returned to the DEA did not match the transaction one could see and hear on the videotape. The jury apparently did not accept this argument and convicted the defendants based on the recordings, the agents' testimony, and the testimony given by the defendants themselves. There is no reasonable probability that the verdict would have been altered by additional inconsistencies.[8]

Second, the DEA report citing an ancient and unrelated offense by Redman is of marginal impeachment value and speaks only to Redman's credibility as an informant; it has no independent bearing on the defendants' guilt or innocence. Since Redman's death prevented him from testifying, the defendants would be able to use this information only to impeach his credibility with regard to hearsay declarations admitted into evidence. See Fed.R.Evid. 806. Even if such hearsay declarations were admitted into evidence, we see no reasonable probability that a bit of stale information about Redman would affect the verdict.[9] As noted, the defendants did challenge Redman's role and credibility as the DEA's informant, and the jury was unimpressed. Moreover, the same material included statements that reinforced Redman's credibility, noted his reliability, commended his scrupulous compliance with DEA rules and regulations, reported that he had not been arrested for twenty years, and undertook to exercise conscientious supervision over him.

On the basis of this review of the evidence against the defendants and the undisclosed materials concerning Redman, we conclude that disclosure of the materials would have created no reasonable probability of a different outcome. *Brady* and its progeny therefore entitle the defendants to no relief.

8. Also, no reasonable probability of a different outcome could be expected to result from Redman's statement that Jackson told him Mazyck could get *powder* cocaine. (Redman Statement, dated Nov. 17, 2000, at 1.) Redman reported this statement on November 17, 2000, nearly one full month before the December 13 transaction for which Mazyck was charged. Mazyck was able to sell whatever he could get at the time.

9. Because we conclude that the information was immaterial, we need not and do not determine whether the video and audio recordings or the DEA agents' testimony actually incorporated hearsay declarations by Redman that were subject to impeachment under Rule 806. *See generally* Fed. RR. Evid. 801–806.

### D. Jencks Act

The Jencks Act, 18 U.S.C. § 3500, permits disclosure of statements made by "a witness called by the United States [who] has testified on direct examination." [10] 18 U.S.C. § 3500(b). The Act provides that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness . . . shall be the subject of . . . discovery . . . until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); *see also* Fed.R.Crim.P. 26.2(a) (providing for disclosure, "[a]fter a witness . . . has testified on direct examination," of "any statement of the witness that is in [the government's] possession and that relates to the subject matter of the witness's testimony").

The Jencks Act categorically concerns statements made by "a witness . . . [who] has testified," 18 U.S.C. § 3500(b), and it mandates disclosure only after "said witness has testified on direct examination in the trial of the case," 18 U.S.C. § 3500(a). Thus, it does not normally mandate disclosure of statements made by a person who does not testify. *See United States v. Pepe,* 747 F.2d 632, 657 n. 37 (11th Cir. 1984) (stating that Jencks Act "did not apply" to statements by two witnesses who did not testify); *United States v. Medel,* 592 F.2d 1305, 1316 n. 12 (5th Cir.1979) (holding that information contained in agents' reports that was "derived from interviews with persons who did not testify for the government . . . is not Jencks material"); *United States v. Biondo,* 483 F.2d 635, 642 (8th Cir.1973) ("The Jencks Act speaks only in terms of a witness who has testified at trial. Defendants do not have

a right under that act to demand . . . production" of statements by an "unidentified employee [who] testified neither before the grand jury nor at trial."); *United States v. Pope,* 415 F.2d 685, 689 (8th Cir.1969) (holding that Jencks Act did not require production of reports, resumes, and letter prepared by "postal inspectors . . . who participated in the investigation, [but] did not testify in the trial"); *cf. United States v. Cuthbertson,* 630 F.2d 139, 144 (3d Cir.1980) (observing that "impeachment statements, although subject to subpoena under rule 17(c), generally are not subject to production and inspection by the moving party prior to trial" because "statements of government witnesses . . . ripen into evidentiary material for purposes of impeachment only if and when the witness testifies at trial").

Anticipating this limitation, Mazyck argues resourcefully that the government's evidence (videotapes, audiotapes, and DEA agent testimony) incorporated hearsay declarations by Redman that were subject to impeachment under Rule 806 of the Federal Rules of Evidence. (Mazyck Br. at 17–21.) Citing Redman's unavailability at trial, Mazyck presses a claim for disclosure implied by the right of impeachment afforded in Rule 806: "When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed. R.Evid. 806.

It appears that criminal defendants rarely invoke Rule 806 in conjunction with a demand for disclosure under the Jencks Act.[11] The only circuit court opinion we

---

10. Congress enacted 18 U.S.C. § 3500 in response to the Supreme Court's ruling in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which held that criminal defendants may inspect government

witnesses' prior statements. *Id.* at 667–72, 77 S.Ct. 1007; *see also In re United States,* 267 F.3d at 145 & n. 10.

11. One commentator has observed:

have found on the subject, *United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir. 1996), considered whether Rule 806 triggered Jencks Act disclosure after hearsay declarations made by a nontestifying witness were admitted into evidence. *Id.* at 512 (noting that it appeared to be "the first court of appeals to address this argument").[12] The D.C. Circuit held that a declarant does not become a witness for purposes of the Jencks Act by virtue of being treated as one for purposes of Rule 801(d)(2)(E) or Rule 806. *Id.* at 513.

■■■■ For purposes of this appeal, we need not decide, and accordingly express no opinion on, whether the Jencks Act requires disclosure of hearsay impeachment materials because, assuming *arguendo* that the government violated such a requirement, the error was harmless.[13] The Supreme Court has stated that, "[s]ince courts cannot 'speculate whether (Jencks material) could have been utilized effectively' at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 47

L.Ed.2d 603 (1976) (citations omitted); *see also Rosenberg v. United States*, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). We have implemented this mandate:

> Where ... the government's Jencks Act violation is inadvertent, the defendant must establish that there is a significant chance that the added item would instill a reasonable doubt in a reasonable juror. Put another way, the failure to disclose may be disregarded if there is no reasonable probability that had the evidence been disclosed, the result would have been different.

*United States v. Gonzalez*, 110 F.3d 936, 943 (2d Cir.1997) (citing *United States v. Nicolapolous*, 30 F.3d 381, 383–84 (2d Cir. 1994)). "A 'reasonable probability,' in this context, means 'a probability sufficient to undermine confidence in the outcome.'" *Nicolapolous*, 30 F.3d at 384 (citing *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). This language closely tracks the materiality test applied under *Brady* and *Giglio*, and derives from the same sources.[14]

---

[J]udging from the infrequency of reported opinions on the subject, criminal defense counsel seldom attempt to employ the existing rules of discovery—limited as they are—to anticipate the prosecution's use of hearsay or to obtain material which might serve to impeach an out-of-court declarant once hearsay has been admitted in evidence. For example, I have found only three federal cases in which criminal defendants sought to use the Jencks Act, 18 U.S.C. § 3500 (1994), as a tool for discovering prior statements of a hearsay declarant.

John G. Douglass, *Balancing Hearsay and Criminal Discovery*, 68 Fordham L.Rev.2097, 2104 n. 21 (May 2000) (citing *United States v. Williams–Davis*, 90 F.3d 490, 512 (D.C.Cir. 1996); *United States v. Pepe*, 747 F.2d 632, 657 n. 37 (11th Cir.1984); and *United States v. Padilla*, No. S1 94 CR 313, 1996 WL 389300, at *2 (S.D.N.Y. July 11, 1996)).

12. In *Pepe*, the Eleventh Circuit noted the defendants' argument that two nontestifying

witnesses' "hearsay declarations were admitted into evidence through the testimony" of two testifying witnesses, but it rejected the Jencks Act claim on other grounds. 747 F.2d at 657 n. 37.

13. Although the materiality analysis set out in the *Brady/Giglio* discussion furnishes a ground for finding harmless error, the author of this opinion would be prepared to hold, as the D.C. Circuit did in *Williams–Davis*, that Fed.R.Evid. 806 triggers no Jencks Act disclosure obligation with regard to nontestifying hearsay declarants.

14. A less demanding standard applies when a Jencks Act violation is deliberate:

> The legal standard to be applied in determining whether a new trial should be granted when the government fails to produce Jencks Act material, 18 U.S.C. § 3500, depends on whether the suppression was deliberate or inadvertent. If the govern-

We have applied this harmless error test in numerous Jencks Act cases. *See, e.g., Nicolapolous,* 30 F.3d at 383–84 (finding Jencks Act error harmless where undisclosed material bore no relevance to the charges, was useful only to impeach a witness whose credibility had already been sufficiently impeached, and did not undermine independent evidence of guilt); *United States v. Petrillo,* 821 F.2d 85, 89–90 (2d Cir.1987) (finding no reasonable probability of a different outcome where the undisclosed material was "merely additional evidence tending to undermine the credibility of [a witness] for reasons already before the jury"). *Cf. United States v. Mourad,* 729 F.2d 195, 199–200 (2d Cir.1984) (rejecting prosecutorial misconduct claim based on delayed Jencks Act disclosure because there was "no showing that the delay resulted in any prejudice, or even that the evidence was material to the issue of guilt").

For the reasons developed in Part III.C.3 above, we see no reasonable probability that disclosure of the additional Redman materials in this case would have yielded a different outcome at trial. The jury's verdict was supported by compelling evidence, and the undisclosed materials had limited utility. Any inconsistencies between the undisclosed materials and the evidence introduced at trial were minor, and the defendants effectively attacked

Redman's role in the drug transactions without the additional materials. Therefore, the Jencks Act, like *Brady* and its progeny, provides no basis to overturn the defendants' convictions.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of conviction.

---

ment deliberately suppresses evidence or ignores evidence of such high value that it could not have escaped its attention, a new trial is warranted if the evidence is merely material or favorable to the defense. But if the government's failure to disclose is inadvertent, a new trial is required only if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.
*United States v. Hilton,* 521 F.2d 164, 166 & n. 2 (2d Cir.1975); *see also United States v. Miranda,* 526 F.2d 1319, 1324–26 & n. 4 (2d Cir.1975).

The defendants do not argue, and we see no basis for alleging, that the government deliberately suppressed the Redman materials. *See United States v. James,* 609 F.2d 36, 49 & n. 16 (2d Cir.1979) (observing that, when defendants "ha[ve] not suggested and the record does not indicate that the government deliberately suppressed the material," the "appropriate test to determine whether a new trial is required" is whether the "added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction").