**UNITED STATES of America**

v.

**Christian PAULINO, Defendant.**

**No. 03 CR. 727 DLC.**

United States District Court,
S.D. New York.

Jan. 30, 2004.

Samidh Guha, Esq., Assistant United States Attorney, United States Attorney's Office for the Southern District of New York, New York, NY, for the Government.

Deidre D. Von Dornum, Esq., Jennifer L. Brown, Esq., The Legal Aid Society, New York, NY, for the Defendant.

## OPINION AND ORDER

COTE, District Judge.

Christian Paulino (the "defendant") was convicted on October 23, 2003, following a three-day jury trial, of possessing with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(b)(1)(C). The defendant now moves for a new trial pursuant to Rule 33, Fed.R.Crim.P. For the reasons set forth below, his motion is denied.

### Background

The issues raised by the defendant require descriptions of the trial, the Government's summation, the rendering of a verdict by a jury of eleven persons, the destruction of one page of handwritten notes made by a law enforcement agent during the defendant's arrest, and the exclusion of testimony about an out-of-court statement made by the defendant's father. A description of the factual background for each of these issues follows. To place the issues in context, however, a summary of the opening statements, trial evidence, and summations is presented first.

### Opening Statements

The trial commenced on October 20. In its opening statement, the Government informed the jury that cocaine had been seized from the defendant's bedroom closet and from a hallway closet in the apartment in which the defendant lived with his parents and sister. The Government asserted that the evidence would show that the cocaine found in the defendant's bedroom closet belonged to the defendant, and that the drugs in the hallway closet belonged to the defendant's father. The Government noted that Adolfo Paulino had immediately assumed responsibility for the cocaine found in the hallway closet, but "did not take responsibility" for the cocaine found in his son's bedroom.

In its opening statement, defense counsel asserted that "the government has the wrong man." The defendant did not possess the cocaine in his bedroom closet. "He did not have control over that cocaine. It did not belong to him." Instead, the cocaine belonged solely to the defendant's father, Adolfo Paulino. "[O]nly he controlled it." The defense argued that Adolfo Paulino stored drug paraphernalia

throughout the apartment, and that the defendant "had no more" to do with the cocaine found in the defendant's closet than his mother or sister did. Defense counsel continued, "How will you be sure that all of the cocaine in Adolfo Paulino's apartment belong to him and only to him? The evidence will show that Adolfo Paulino admitted to the police that the cocaine was his."

*Trial Evidence*

The following facts were established at trial. On or about November 2002, the defendant's father, Adolfo Paulino, was indicted in the District of Connecticut for conspiracy to possess with intent to distribute more than 120 kilograms of cocaine. A warrant for Adolfo Paulino's arrest had issued, but drug enforcement agents had been unable to locate him. Eventually, the United States Marshals Service ("Marshals Service") traced Adolfo Paulino to an apartment in the Bronx. Adolfo Paulino was living in the apartment with his wife and two children, the defendant and the defendant's sister.

On May 7, 2003, in the early morning hours, agents and officers from the Drug Enforcement Agency ("DEA"), the Marshals Service, and the Connecticut Police Department (collectively, "agents") executed an arrest warrant for Adolfo Paulino at the Bronx apartment. The DEA agents from Connecticut and the Connecticut police officers participated in the arrest because it was their investigation which had culminated in Adolfo Paulino's indictment. The Marshals Service was present because it had assisted in locating Adolfo Paulino.

Immediately upon being admitted into the apartment, the agents conducted a protective sweep in order to identify all of the residents and to prevent any destruction of evidence. They found Adolfo Paulino in the master bedroom, and placed him under arrest. In the defendant's bedroom, agents saw in plain view a small measuring scale covered with traces of a powdery residue, glassines, plastic sandwich baggies and razor blades. The defendant was escorted into the living room, where the defendant's mother and sister were being held during the protective sweep.

After receiving Adolfo Paulino's written consent to search the apartment, the agents proceeded to conduct a more thorough search of the residence. Two cell phones, two pagers, and approximately $700.00 in cash were recovered from Adolfo Paulino's bedroom. In the hallway closet, which was opened with a key from Adolfo Paulino, the agents found a Domino sugar bag containing cocaine, as well as additional bags of cocaine stored inside pairs of shoes. It was later determined that the cocaine in the hallway closet was 46 percent pure and totaled approximately 295 grams. Adolfo Paulino told a DEA agent that "the drugs in the hall closet were his," "that he had no other drugs in the apartment," and that "no one else was involved in the drugs." The Court instructed the jury that this conversation between Adolfo Paulino and the agent was not being admitted for its truth, but rather to aid the jury in understanding the course of events that unfolded that day.

The same DEA agent proceeded to question the defendant on what he knew about the cocaine found in the hallway closet. After receiving his Miranda rights, the defendant stated that the hallway closet and its contents belonged to his father, and he "had nothing to do with that closet, the hall closet." The defendant stated that he had no knowledge of any other drugs in the apartment.

The agent obtained permission from the defendant and his sister to search their respective bedrooms. In the defendant's sister's bedroom, the agents found approx-

imately $2,000.00 in cash hidden inside her socks. In the defendant's bedroom, they found another scale and additional drug packaging paraphernalia. Inside the defendant's closet, underneath clothes and other possessions, the agents uncovered a plastic grocery bag, inside of which was a freezer bag containing approximately 190 grams of cocaine. Tests later revealed the defendant's fingerprints on the grocery bag and on the first plastic bag on the roll of sandwich baggies found in his bedroom. Tests also showed that the cocaine found in the defendant's bedroom closet was approximately 3.9 percent pure.

The Connecticut DEA agents advised Adolfo Paulino that narcotics had been found in his son's bedroom closet. After contacting his office, a New York DEA agent determined that the defendant would be placed under arrest for possession of the cocaine found in his bedroom closet. The defendant was taken into the hallway, a few feet away from Adolfo Paulino, handcuffed and placed under arrest. Neither at that time, nor at any other time during that day, did Adolfo Paulino take responsibility for any drugs found in the apartment except for the cocaine found in the hallway closet.

*Rule 404(b)*

The final piece of evidence offered by the Government was evidence that the defendant had been convicted in 2000 of a sale of crack cocaine. In a September 29 pre-trial submission, the Government had moved to introduce evidence at trial pursuant to Rule 404(b), Fed.R.Evid., in order to show the defendant's knowledge and intent

to possess cocaine with intent to distribute it. Specifically, the Government sought to put into evidence (1) the testimony of law enforcement officers who had arrested the defendant on April 9, 2003, less than a month before the search of the apartment. The Government sought to introduce the officers' observations that led them to conclude that the defendant was managing a street level drug "spot" and taking money from those he was supervising for the drugs that they sold; (2) the defendant's conviction on February 4, 2000, for criminal sale of a controlled substance in the third degree in New York Supreme Court, Bronx County; and, (3) the defendant's conviction on December 3, 1999, for attempted criminal sale of a controlled substance in the third degree in New York Supreme Court, Bronx County. The controlled substance in all of the defendant's prior criminal acts was crack cocaine.

The defendant had opposed the admission of the 404(b) evidence on the grounds, *inter alia*, that the evidence was not relevant to any issues in dispute since the defendant would not raise lack of knowledge or lack of intent as a defense at trial. According to defense counsel, the defendant's theory would be that the cocaine found in his bedroom closet in fact belonged solely to his father.

Prior to the trial, the Court had issued a preliminary ruling admitting one similar act, either the 2000 conviction or the facts surrounding the 2003 arrest, since the crime of possession (as well as the crime of aiding and abetting)[1] included as elements

---

1. In a September 29 letter, the Government asserted that similar act evidence was admissible because the defendant was being charged under a theory of possession of drugs as well as "under an aiding and abetting" theory pursuant to 18 U.S.C. § 2." At the final pretrial conference, the Court sought clarification from the Government since its requests to charge had not included an aiding and abetting request. The Government confirmed that it was requesting an aiding and abetting charge in light of the defendant's disclosure to the Government on October 2 that Adolfo Paulino was claiming ownership of the drugs found in the defendant's bedroom closet. Adolfo Paulino's claims are described below.

the issues of the defendant's knowledge and intent, and the defendant had not sufficiently removed those issues from the case as of that time. The Court reserved a final decision until the end of the presentation of the evidence. The defendant submitted that the admission of the 2000 conviction would be preferable. Near the close of the Government's case-in-chief, the Court ruled that the defendant had not sufficiently removed knowledge and intent from the case, and that the 2000 conviction for the sale of crack cocaine was admissible to show the defendant's knowledge and intent both on the possession charge as well as on the charge of aiding and abetting.

On October 22, at the close of its case, the Government read to the jury an excerpt from the defendant's plea allocution for the 2000 conviction, and put into evidence a copy of the defendant's judgment of conviction. The parties stipulated that the controlled substance referred to in the plea allocution and judgment of conviction was crack cocaine.

The Government rested its case. The defendant did not call any witnesses.

*Summations*

In its summation, the Government asserted that the drugs found in the defendant's bedroom closet belonged to him and addressed the defendant's argument, made in its opening statement and through the cross examination of the Government's witnesses, that Adolfo Paulino controlled those drugs. The Government argued that the evidence not only showed that the defendant controlled his bedroom closet, but also that there was no evidence to support the assertion in the defendant's opening statement that Adolfo Paulino had

claimed responsibility for the drugs with which his son was charged.

[The] defense rested on their opening by saying, 'The evidence will show you that Adolfo Paulino admitted to the police the cocaine was his. Adolfo Paulino told them no one else was involved in the cocaine....' That is simply incorrect. The evidence you heard was that Adolfo Paulino admitted to the cocaine found in the locked hallway closet. He never admitted to police that any other cocaine found in the apartment was his.

The defense did not object to any statements made by the Government during its summation.

In her summation, defense counsel contended that the defendant had been falsely arrested. She argued that the drugs found in the defendant's bedroom closet in fact belonged to his father, who "stored his drugs and the tools of his drug trade throughout, all over that apartment." Defense counsel argued that the agents assumed from the time they entered the apartment that the defendant was a criminal, and "from that lens...the officers in this case interpreted every piece of evidence to support the conclusion they had already formed in their mind." Defense counsel maintained that Adolfo Paulino's assumption of responsibility for the drugs found in the hallway closet extended to all the drugs found in the apartment, including those with which the defendant was charged. She emphasized that Adolfo Paulino had said that "no one else in the house is involved," and argued that meant that no one else in the apartment had any responsibility for the drugs found anywhere in the apartment.

In its rebuttal summation, the Government reiterated that Adolfo Paulino had

---

The defendant did not object to the inclusion of the aiding and abetting charge either at the final pre-trial conference or at the charging conference. Its request to modify the charge given to the jury was granted.

never assumed responsibility for the drugs found in the defendant's bedroom closet. "There is no evidence, none, that Adolfo Paulino took responsibility for the drugs in Christian Paulino's bedroom closet. All the evidence points to Adolfo Paulino's not knowing about the drugs in Christian Paulino's bedroom closet." The Government also noted that, even if Adolfo Paulino also possessed the drugs found in the defendant's bedroom closet, the defendant should still be found guilty under the law.

> Christian Paulino possessed those drugs in his bedroom closet. Whether or not he owned those drugs, that he was the only person who owned those drugs is not relevant. It is possible the drugs were also possessed, also handled by Adolfo Paulino. There is no evidence of that, but it's possible. But it doesn't matter.... Both Christian and Adolfo Paulino could have possessed those drugs.

Defense counsel did not object to any arguments made by the Government during its rebuttal.

*Dismissal of Juror No. 12*

The jury began its deliberations at approximately 4:10 p.m. on October 22. At that time, the four alternate jurors were dismissed. The jurors were unable to reach a verdict by the end of the day, and were asked to return the next day to continue their deliberations.

The next morning, Thursday, October 23, the Courtroom Deputy ("Deputy") retrieved two voicemail messages from jurors. At approximately 7:05 a.m., juror number 12 ("Juror 12") had left a voicemail message stating that she was ill, that she had a fever, and that she would be unable to deliberate that day. At approximately 7:58 a.m., juror number 1 ("Juror 1") had left a voicemail message indicating that she had an emergency that she had to take care of that day. The Court instructed its Deputy to call back the jurors. Juror 12 was instructed to contact the Court around lunchtime to update the Court on her condition and her availability to deliberate. Juror 1 informed the Deputy that her car battery had died, that she had been unable to successfully charge the battery, and that she could not leave her car on the street due to street cleaning that day. She informed the Court that she hoped to return to the courthouse later that morning. Both Juror 1 and Juror 12 were informed by the Deputy that the trial could not continue without them, that the alternate jurors had already been dismissed, and that the parties, as well as the other jurors, would be waiting for their return.

After consulting with counsel, the Court instructed the ten remaining jurors that two jurors had had separate emergency situations that prevented them from joining the jury that morning. The Court asked the ten jurors to return to the courthouse by 2 p.m., at which time more information on the absent jurors' situations would be available.

At a 2 p.m. conference, the Court informed counsel that Juror 1 had arrived, but that Juror 12 had called the courthouse around 12:35 p.m. to report that she was too ill to deliberate that day. The Court recounted the conversation that took place with Juror 12:

> She said that she feels a little better, but not much better. She indicated that she had some kind of bug, that it was probably a stomach virus. She said besides running a fever, she was constantly using the restroom. She said that she would not be able to return to court today and that based on how she now feels, she wouldn't be able to return tomorrow either.

Juror 12 was asked at two distinct points in the conversation if she was informing the Court that "she would not be able to return to deliberate on this case either today or tomorrow." The juror "confirmed that was correct." Juror 12 stated that based on what she now understood, that "the earliest she would probably be able to return to participate in deliberations was Monday." The Court told the parties that the juror had said "three times in three different ways that it was her present judgment that she could not be here either today or tomorrow." In the most recent conversation she had been "very emphatic" that she "definitely could not deliberate effectively either today or tomorrow."

The defendant requested that the Court wait until Friday to make a good cause determination whether to continue deliberations with eleven jurors. The defendant argued that Juror 12 might have a stomach virus that could "pass quickly". The defendant further submitted that even if Juror 12 could only return on Monday, it would still be preferable to wait for her rather than to continue deliberations with eleven jurors. The Government submitted that good cause existed under Rule 23(b) and Second Circuit case law to dismiss the sick juror and to proceed with a jury of eleven members.

Over the defendant's objection, the Court found that good cause existed to dismiss Juror 12 based on the juror's representation that she would not be well enough to deliberate until after the weekend. The Court expressed its concern with having a four day delay in deliberations after a relatively short trial. The Court also noted that several other jurors had revealed potential time conflicts during *voir dire* that might further disrupt deliberations were the Court to wait for Juror 12 to return. Juror 1 had already

demonstrated that she was experiencing transportation issues; Juror number 6 suffered from diabetes and high blood pressure; Juror number 8 had been recently laid off work and was expected to want to return as soon as possible to his job search; and Juror number 9 had informed the Court during *voir dire* that she was undergoing fertility treatments, and that sometime during the next week, at a date and time outside her control, she would have to be excused for medical appointments relating to her treatment. The Court determined that deliberations would proceed with eleven jurors pursuant to Rule (23(b), Fed.R.Crim.P).

At approximately 2:15 p.m., the Court instructed the eleven remaining jurors to resume their deliberations. A verdict of guilty was delivered by the jury approximately two hours later.

Papers filed by the defendant in support of this motion reveal the following. On October 24, a defense investigator telephoned Juror 12's place of employment and spoke to a woman who confirmed that she had been Juror 12. The woman stated that on the previous day she had been afflicted with the stomach flu, but that she was well enough to be at work that day.

*Deputy Iaquinto's Missing Notes*

One of the four agents called by the Government to testify about the May 7 searches and arrests was Deputy U.S. Marshal Anthony Iaquinto ("Iaquinto"). Iaquinto had assisted the DEA in locating Adolfo Paulino. Because of that assistance, he accompanied the agents as they executed the warrant for Adolfo Paulino. During cross-examination, Iaquinto revealed that he had made one page of notes in a memo pad at the time of the arrest. Iaquinto testified that he thought the memo pad was at his Connecticut office.

Iaquinto stated that he had prepared a "USM 11" report the day after the arrest.

A USM 11 is an official report prepared by a U.S. Marshal "to memorialize the steps" taken in the investigation of a case. In his report, Iaquinto noted that Adolfo Paulino's wife opened the front door to the apartment to let in the agents; that the agents placed Adolfo Paulino under arrest; that Adolfo Paulino was Mirandized; that Adolfo Paulino gave both oral and written consent to the search of his apartment; and that cocaine and currency were seized from the apartment. The USM 11 did not contain any statements made by either Adolfo Paulino or the defendant. According to Iaquinto, "My role was to locate Adolfo Paulino and place him under arrest." Iaquinto had no responsibility for Adolfo Paulino after his arrest.

The Court excused Iaquinto as a witness, but asked him to remain in the witness room. At a break, the Court asked the parties to discuss among themselves how to address the issue of Iaquinto's notes. At the end of the day, the Government informed the Court that Iaquinto had instructed his colleagues to search his Connecticut office for the missing memo pad, but that it had not been located. According to the Government,

> [Iaquinto's] recollection is that his notebook had three lines that included the time of the arrest, the location, Adolfo Paulino's name, things like that, which he intended to use to put into his report...the defense did not receive this 3500, and that he destroyed it in the regular course, that's his practice. That he does not keep those records, and that he certainly did not destroy it because it was relevant to this trial.

Iaquinto's standard practice was to "destroy his memo books at some point after the events that he records in them have occurred" and their contents have been memorialized in his formal arrest report. The Government argued that all of the information contained in the handwritten notes had already been provided to the defendant in the form of Iaquinto's USM 11. The Court directed the Government to perform a more thorough search for the memo pad, and ruled that further testimony from Iaquinto on the issue could be postponed until after the verdict. The defendant made no request to recall Iaquinto for further questioning before the jury.

On November 13, a post-trial hearing ("Hearing") was held on the destruction of Deputy U.S. Marshal Iaquinto's handwritten notes. Iaquinto testified that, during an arrest, he typically would write down pedigree information such as names and dates of birth in order to refresh his recollection at the time he drafted the official report of the arrest. At the close of an investigation, Iaquinto would "flip through" his notebook in order to be certain that his notes had been memorialized in the official report, and subsequently would destroy the notebook. Iaquinto did not take notes pursuant to any rule or procedure of the U.S. Marshal Service.

Iaquinto confirmed that he had taken contemporaneous notes into a notebook in connection with the arrests of the defendant and his father. The content of Iaquinto's notes on the day of the defendant's arrest "was for the most part just pedigree information and a couple of times." Iaquinto's notes included

> the time we made entry and the date we made entry into the apartment [,] that Adolfo was placed under arrest without incident and also arrested that day was Christian Paulino. I don't recall if I wrote arrested that day, but I recall putting Christian Paulino's name and date of birth and he was taken into custody by DEA.

Iaquinto stated that he had a "pretty good recollection" of what he had written down that day, and that he was "pretty sure that

everything that was in my notes appears in the [USM 11] report." Iaquinto estimated that the notebook would have been destroyed around mid-July 2003.

Iaquinto first spoke to the Government about the case in mid to late September. At that time, the Government had asked him to turn over any information or reports pertaining to the case. The Government had never given him "any limiting instructions on what to turn over or what not to turn over." It was Iaquinto's understanding that he was "to turn over anything [he] had related to the case." Iaquinto turned over to the Government all the information he had pertaining to the defendant. According to Iaquinto, the Government never specifically asked him about any notebooks, nor could he recall any specific request for handwritten notes. Iaquinto testified that he had never thought to check for his notebook "because subconsciously I knew it wasn't there. I knew it had been destroyed." He never informed prosecutors that he might have had handwritten notes on the arrest. Iaquinto testified that the first time he had looked for the memo pad containing his notes on the arrest was after being asked for it by defense counsel at trial.

*Adolfo Paulino's Statements*

On the morning the trial began, the Court denied the defendant's motion to introduce at trial a statement made by his father approximately one month after the defendant's arrest. According to defense counsel's submissions, on June 2, 2003, Adolfo Paulino, together with his wife and daughter, appeared at the Federal Defender Division of the Legal Aid Society and asked to speak to the defendant's lawyer. The defendant was then represented by John Byrnes ("Byrnes"). Immediately upon meeting with Byrnes, Adolfo Paulino "blurted out" that the drugs for which his son had been arrested were his, and not those of his son. Byrnes summoned his Chief Investigator into the room, and had Adolfo Paulino repeat the assertion. Aware that Adolfo Paulino was facing charges in the District of Connecticut, Byrnes asked if he was represented by counsel. Upon obtaining contact information for Adolfo Paulino's lawyer, Byrnes ceased further conversation with Adolfo Paulino.

On September 23, in an *ex parte* letter submission, the defendant's trial counsel, who was another member of the Federal Defender Division, requested that either Byrnes or the Investigator be allowed to testify as to their conversation with Adolfo Paulino. Since Adolfo Paulino's attorney had indicated that, if subpoenaed, Adolfo Paulino would assert his Fifth Amendment privilege against self-incrimination, the defendant sought to introduce the testimony as an admission against penal interest pursuant to Rule 804(b)(3), Fed.R.Evid. At that time, the trial was scheduled to begin on October 7. The Court declined to rule on an *ex parte* motion, and ordered the defendant, if it wanted an evidentiary ruling, to disclose to the Government the contents of the September 23 letter by no later than 5 p.m. on October 2, the day before the final pretrial conference. The Government submitted its opposition to the defendant's motion on October 3. The trial date was thereafter adjourned for other reasons to October 20.

On October 20,[2] prior to the commencement of trial, the Court denied the request

---

2. The morning of October 22, on the last day of trial, defense counsel again attempted to introduce Adolfo Paulino's June 2 statement to Byrnes, this time as an inconsistent state-

ment pursuant to Rule 806, Fed.R.Evid. Defense counsel sought to admit as an exception to the hearsay rule the May 7 statement by Adolfo Paulino that there were no other drugs

because there was insufficient corroboration of both Adolfo Paulino's and the statement's trustworthiness. *See, e.g., United States v. Jackson*, 335 F.3d 170, 178 (2d Cir.2003). In reaching its conclusion, the Court noted, *inter alia*, that Adolfo Paulino had been charged in a federal indictment for his role in a major cocaine trafficking conspiracy; that Adolfo Paulino had been present when agents discovered 190 grams of cocaine hidden in his son's bedroom closet and had seen his son being arrested in connection with those drugs; and that Adolfo Paulino did not claim ownership of the drugs in the defendant's closet at that time, despite having already admitted ownership of the drugs found in the hallway closet. The Court also found that Adolfo Paulino had an obvious motive to lie to protect his son. In addition, Adolfo Paulino's confession to his son's lawyer carried little added risk of exposure since the statement was made to a defense attorney, indeed a defense attorney employed by the same organization as his own attorney,[3] and Adolfo Paulino was already facing serious criminal charges both in the Southern District of New York and in the District of Connecticut.[4]

On October 21, the night before the last day of the trial, Thomas Belsky, Esq. ("Belsky"), Adolfo Paulino's Legal Aid lawyer, informed the defendant's counsel that "plea negotiations" encompassing "all" the cocaine in the apartment "appeared to be a possibility." Belsky said that he would keep defense counsel informed.[5] On the morning of October 22, approximately fifteen minutes before court convened, Belsky called the Government. According to Belsky's affidavit, he called to inquire whether the Government "would consider consolidating the charges pending against Adolfo Paulino in the District of Connecticut with the charge pending against him in the Southern District of New York" for the cocaine found in the hallway closet. Belsky also raised "the possibility of commencing negotiations of a guilty plea by Adolfo Paulino to all of the cocaine found in the Paulino apartment on May 7, 2003, including the cocaine his son, Christian, had been charged with possessing." Belsky indicated to the prosecutors, however, "that this was not a specific plea offer." According to an affidavit from one of the Assistant United States Attorneys with whom Belsky spoke, the telephone call lasted no longer than one or two minutes, and "at no time did Mr. Belsky ever state that Adolfo Paulino actually owned or possessed the cocaine recovered from the defendant's bedroom closet."

Around noon that day, the defendant's attorney received a telephone message from Belsky indicating that he had "nothing helpful to report." During the lunch break, defense counsel attempted to contact Belsky but was unable to reach him. Late that morning, the Government rested. Summations began at approximately 2 p.m. Sometime after the jury had retired to deliberate, the Government informed defense counsel of its telephone conversation with Belsky. Defense counsel did not

---

in the apartment apart from those found in the hallway closet. Defense counsel would then impeach Adolfo Paulino by offering his admission to Byrnes that the drugs from the defendant's closet were his. The applications were denied.

**3.** Adolfo Paulino's lawyer and the defendant's lawyers are employed by the Legal Aid Society.

**4.** The Southern District of New York was prosecuting Adolfo Paulino for the drugs seized from the hallway closet.

**5.** The description of the conversation appears in defense counsel's memorandum in support of the motion for a new trial.

raise the issue with the Court at any time before the verdict.

On January 12, 2004, defense counsel submitted a one-page hand-written letter in Spanish by Adolfo Paulino dated December 15, 2003. The letter was written shortly after Adolfo Paulino pleaded guilty to drug charges in Connecticut that carry a mandatory minimum sentence of ten years in prison. As translated, Adolfo Paulino's letter states, in pertinent part:

> Distinguished Madam, . . .
>
> The motive for this is to say that the "cut" that was in or found in my son, Christian Paulino's room, was given to me to hold by a friend named Richard on the 19 December 2002 because he was going on a trip to Santo Domingo. By mistake I put it into Christian's closet and forgot about it. When the police searched that room they found it and blamed him.
>
> I want you to be benevolent with my son because I was to blame.

Defense counsel received the letter from the defendant's mother on the evening of January 8, who had apparently received the letter before Christmas.

### Discussion

The defendant moves for a new trial, contending that (1) the destruction of Iaquinto's notes violated 18 U.S.C. § 3500 ("The Jencks Act"); (2) the Government committed a *Brady* violation in failing to disclose the mid-trial telephone call made by Adolfo Paulino's lawyer to the Government; (3) Adolfo Paulino's December 15 letter supports the defendant's claim of innocence and warrants a new trial; and (4) the Court abused its discretion in finding good cause to dismiss Juror 12, and permitting a jury of eleven members to return a verdict. In the course of making these arguments, the defendant also asserts that the Government engaged in prosecutorial misconduct in its closing statement by arguing that there was no evidence showing that Adolfo Paulino took responsibility for the drugs found in the defendant's bedroom closet.

■ Rule 33 authorizes a district court to grant a new trial "if the interests of justice so require." Rule 33, Fed. R.Crim.P. Such motions are "disfavored" in this Circuit. *United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995). They may be granted only with "great caution." *United States v. Middlemiss,* 217 F.3d 112, 122 (2d Cir.2000). The motion should be granted, however, where there has been a "manifest injustice." *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001). "Competent, satisfactory and sufficient evidence" must support the verdict. *Id.* (citation omitted).

### *Deputy Marshall Iaquinto's Notes*

■ The defendant contends that Iaquinto's missing notes are critical because they "may have" reflected a statement by Adolfo Paulino that he accepted responsibility for all of the drugs seized from the apartment. The Jencks Act requires the Government to produce, after a Government witness's direct testimony, any "statements" of that witness that "relate[ ] to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (2002). Under the Jencks Act, a "statement" is defined as:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a *substantially verbatim recital of an oral statement* made by said witness and *recorded contemporaneously* with the making of such oral statement. . . .

18 U.S.C. § 3500(e) (emphasis supplied). A note or recording is a "substantially verbatim recital" of a witness's statement if it "could fairly be deemed to reflect fully and without distortion what had been said to the government agent and thus be used to impeach the witness's testimony at trial." *United States v. Scotti,* 47 F.3d 1237, 1249 (2d Cir.1995) (citation omitted). If the witness is a law enforcement agent, "precedent in this Circuit holds that [the agent] need not preserve such notes if the agent[ ] incorporate[s] them into formal reports." *United States v. Elusma,* 849 F.2d 76, 79 (2d Cir.1988). *See United States v. Barlin,* 686 F.2d 81, 91 (2d Cir. 1982).

■ Even if the suppressed statement of a Government witness is deemed Jencks Act material, that fact alone does not automatically give rise to a new trial. Whether a new trial must be granted "depends on whether the suppression was deliberate or inadvertent." *United States v. Jackson,* 345 F.3d 59, 77 n. 14 (2d Cir.2003) (citation omitted). If the Government "deliberately suppresses evidence or ignores evidence of such high value that it could not have escaped its attention, a new trial is warranted if the evidence is merely material or favorable to the defense." *Id.* On the other hand, if the Government's failure to disclose was inadvertent or negligent, "a new trial is required only if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id.; see United States v. Nicolapolous,* 30 F.3d 381, 383 (2d Cir.1994) (harmless error standard must be strictly applied in Jencks Act cases) (*citing Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976)).

■ The destruction of the limited notes taken by Iaquinto at the time of the defen-

dant's arrest does not violate the Government's obligation under the Jencks Act. As Iaquinto emphasized at both the trial and the Hearing, his notes were memorialized in his USM 11 report, which was turned over to the defendant prior to the trial.

Even if Iaquinto's notes are deemed Jencks Act material, the Government's failure to disclose them does not require a new trial. The failure to preserve or disclose the notes was not a deliberate act to prevent their disclosure. The prosecutors had no knowledge that Iaquinto had taken contemporaneous notes on the day of the defendant's arrest, and Iaquinto did not intentionally withhold his notes from the prosecutors. Even the defendant acknowledges that "there is no reason to suspect evil motive or foul play on Deputy Marshal Iaquinto's part."

Because the failure to disclose was inadvertent, the defendant bears the burden of showing that Iaquinto's one page of notes would have led to an acquittal. The defendant has not met that burden. According to Iaquinto's entirely credible testimony at the Hearing, the notes consisted solely of pedigree information, the vast majority of which was incorporated into his formal report. There is no reason to believe that his notes contained any statement of substance by Adolfo Paulino about ownership of the drugs. Iaquinto's role on May 7 was confined to the apprehension of a fugitive. He had no responsibility for the underlying drug investigation. Thus, there is no reasonable probability that the result of the trial would have been different had the Government disclosed Iaquinto's notes.

*Brady Violation*

The defendant contends that the Government's delay in recounting its conversation with Belsky violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The

Government has a constitutional duty to disclose evidence favorable to the accused when such evidence is material to guilt or punishment. *Id.* at 87, 83 S.Ct. 1194. Under *Brady,* "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." *United States v. Gil,* 297 F.3d 93, 101 (2d Cir.2002) (citation omitted). To establish a *Brady* violation, the material evidence at issue "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Gil,* 297 F.3d at 101. Evidence is material if it "could reasonably have been taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir.2001) (citation omitted). Materiality is, therefore, judged in the context of the trial evidence. *Gil,* 297 F.3d at 103. Where there is substantial evidence against the defendant, the withheld *Brady* evidence is "less likely to be material than if the evidence of guilt is thin." *Id.*

■ Although *Brady* requires the Government to disclose material exculpatory evidence, the Government need not disclose "all evidence in its possession that might assist defense preparation." *Middlemiss,* 217 F.3d at 123. There is "an exception to the disclosure obligation where the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *Jackson,* 345 F.3d at 73 (citation omitted).

■ The Government's failure to disclose prior to the close of the evidence that Belsky had called the Government to raise the possibility of commencing plea negotiations by Adolfo Paulino does not constitute a *Brady* violation. Defense counsel herself was well aware of Adolfo Paulino's claims to her colleague Byrnes regarding the cocaine found in the defendant's bedroom closet. Belsky himself informed defense counsel the night before he contacted the Government that plea negotiations encompassing all of the cocaine in the apartment appeared to be a "possibility."

Because defense counsel had at least equal access to Adolfo Paulino and to Belsky, the telephone conversation between the Government and Adolfo Paulino's lawyer did not constitute *Brady* material. The only information to which the defendant did not have immediate access was the Government's reaction to Belsky's exploratory telephone call. The Government's rejection of Belsky's overture is not *Brady* material. Belsky himself indicated to the defendant's counsel that, based on his conversation with the Government, there was "nothing helpful to report." Underscoring the lack of significance attached by defense counsel to the Government's disclosure of its conversation with Belsky, defense counsel made no reference to it at any time during the trial. The conversation was first raised with the Court in an October 27 letter when defense counsel asked for more time to make a Rule 33 motion. This was four days after the Government had informed defense counsel of the conversation.

Moreover, Belsky's conversation with the Government was not, as the defendant argues, admissible under Rule 804(b)(3), Fed.R.Evid., as a statement against penal interest. *See Jackson,* 335 F.3d at 178. There was no entry of a plea of guilty or even an offer to plead guilty. There was

simply no clear statement by Belsky on behalf of Adolfo Paulino regarding the drugs for which the defendant was convicted that inculpated Adolfo Paulino. Furthermore, the defendant was convicted of possessing drugs with the intent to distribute them. This required proof that, *inter alia,* he knew of the drugs, exercised control over them and intended to transfer them. His father's alleged ownership of the same drugs does not exculpate the defendant; it is not inconsistent with the defendant's guilt.[6]

*Prosecutorial Misconduct: The Government's Summation*

The defendant contends that the Government's summation argument that there was "no evidence" that Adolfo Paulino had taken responsibility for the defendant's drugs deprived it of a fair trial. The defendant did not object to the Government's summation.

■■ The Government is given "broad latitude" to suggest reasonable inferences to the jury during summation. *United States v. Edwards,* 342 F.3d 168, 181 (2d Cir.2003) (citation omitted). The Government is permitted to respond to the defendant's "arguments impugning the integrity of its case and to reply with rebutting language suitable to the occasion." *United States v. Salameh,* 152 F.3d 88, 139 (2d Cir.1998) (citation omitted). A new trial

based on summation statements should be granted only when "the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." *Id.* (citation omitted). The court must consider not only the impact of the prosecutor's remarks, "but must also take into account defense counsel's opening salvo." *Id.* (citation omitted). Where the defendant failed to object to the Government's summation during trial, a new trial is warranted only where there was "flagrant abuse." *United States v. Zichettello,* 208 F.3d 72, 103 (2d Cir.2000) (citation omitted).

■ The defendant argues that the Government engaged in prosecutorial misconduct in its rebuttal summation because, despite having received the telephone call from Belsky earlier that morning, it stated that there was "no evidence" that Adolfo Paulino took responsibility for the cocaine in the defendant's closet or that Adolfo Paulino claimed that all the drugs in the apartment were his.[7] The Government's closing statements were fair arguments. They were an appropriate response to the defendant's argument both during his opening statement and his summation that the drugs belonged to Adolfo Paulino. Defense counsel argued from statements made by Adolfo Paulino that he owned all of the drugs seized in the apartment.[8]

---

6. The defendant also contends that Belsky's testimony would have been admissible to impeach Adolfo Paulino as an out-of-court declarant pursuant to Rule 806, Fed.R.Evid. The defendant has not shown that Belsky's statements to the Government are inconsistent with Adolfo Paulino's hearsay statements.

The defendant identifies two statements made by Adolfo Paulino that were presented to the jury and that he wishes to impeach. The first statement, Adolfo Paulino's admission that the drugs in the hallway closet were his, was not received for its truth. The second statement is Adolfo Paulino's silence after his son's arrest. Belsky's conversation does

not impeach Adolfo Paulino's silence. Belsky never said anything that exculpated the defendant.

7. Although the defendant does not make this argument, to the extent it has merit, the prosecutorial misconduct allegation could as readily be based on the Government's knowledge of Adolfo Paulino's pre-trial statements to Byrnes. The result, however, would not differ.

8. Although Adolfo Paulino's statements had not been admitted into evidence, they were presented to the jury in order to aid their

This is also not a case where the Government made an argument in bad faith. It did not argue to the jury that a fact did not exist when it knew otherwise. Based on all of the facts known to the Government, it was entitled to disbelieve, and argue against, any claim by defense counsel that the father, but not the son, had criminal responsibility for the drugs seized from the son's closet.

### Adolfo Paulino's December 15 letter

The defendant contends that Adolfo Paulino's letter of December 15 is newly discovered evidence that entitles him to a new trial. In the letter, Adolfo Paulino asks this Court to be "benevolent" when sentencing his son since Adolfo Paulino had stored the drugs in his son's bedroom closet five months before the search uncovered them.

■ Newly discovered evidence warranting a new trial is evidence that is "material to the verdict, could not with due diligence have been discovered before or during trial, and is not cumulative." *United States v. Petrillo*, 237 F.3d 119, 123 (2d Cir.2000) (citation omitted). A motion for a new trial on this basis may only be granted *"in the most extraordinary circumstances."* *Id.* (citation omitted) (emphasis in original). Material evidence is "of a sort that could, if believed, change the verdict." *Gambino*, 59 F.3d 353, 364 (2d Cir.1995); *Middlemiss*, 217 F.3d at 122–23.

■ Adolfo Paulino's December 15, 2003 letter, received by this Court on January 12, is not newly discovered evidence. The defendant was aware months before the trial of Adolfo Paulino's efforts to claim responsibility for all of the drugs found in the apartment (despite having failed to do so when watching his son get arrested for the drugs found in the son's bedroom closet).

Moreover, the statements in the letter are not reliable evidence exculpating the defendant. Nothing in the letter refutes the fact that the drugs were in his son's bedroom closet inside a bag on which his son's fingerprint was found. The letter is not inconsistent with the defendant knowing that the drugs were in his closet, or with the defendant exercising control over those drugs along with his father with the intent to hide them until his father needed them. The letter is a plea for mercy at his son's sentencing, written at a time when Adolfo Paulino had pleaded guilty to charges that carry a minimum mandatory sentence of ten years. All of these factors indicate that the letter does not present the extraordinary circumstances that require a new trial.

### Excusal of Juror 12

■ Under Rule 23(b), Fed.R.Crim.P., "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Rule 23(b)(2), Fed.R.Crim.P. A district court is granted broad discretion in finding "good cause"[9] to dismiss a juror. *United States v. Reese*, 33 F.3d 166, 173 (2d Cir.1994). A court must, however, have "sufficient information to make an informed decision." *Id.*

understanding of the course of the search as it unfolded.

9. In older case law, the test for excusing a juror is referred to "just cause". The Advisory Committee Notes to the 2002 Amendment to Rule 23(b) provides: "the term 'just cause' has been replaced with the more familiar 'good cause,' that appears in other rules. No change in substance is intended." Rule 23(b), Adv. Comm. Notes, 2002 Amend., Fed. R.Crim.P.

■ The duration of the trial does not determine the propriety of accepting a verdict by eleven jurors. *United States v. Gibson*, 135 F.3d 257, 260 (2d Cir.1998). "Verdicts by fewer than eleven jurors are proper even in short trials." *Id.* Among the factors that may influence a court's decision to excuse a juror are the risk that jurors' recollections of evidence will be dulled by a delay, and the risk that jurors will discuss the case with outsiders during any adjournment. *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir.1985). A juror may not be excused, however, as a pretext to arrive at a unanimous verdict. *Reese*, 33 F.3d at 173. The Second Circuit has approved an eleven juror verdict in a variety of situations. *See, e.g., United States v. Casamento*, 887 F.2d 1141, 1187 (2d Cir.1989) (juror dismissed because his daughter had received a threatening phone call, despite no evidence linking the phone call to any of the defendants); *Stratton*, 779 F.2d at 831 (juror excused to observe a religious holiday).

■ Based on information available at the time of trial, there was good cause to dismiss Juror 12 and to allow an eleven person jury to deliver its verdict. Juror 12 represented to the Court repeatedly that she would be unable to deliberate either on Thursday, October 23, or Friday, October 24. The earliest she would be able to return to the courthouse would be four days later, on Monday, October 27. Juror 12 was emphatic in her belief that her illness would not improve before the weekend, repeating at least three times over the telephone that she would not be well enough to deliberate either that day or the next day. There was no suggestion that Juror 12 was a holdout for acquittal.

A delay of four days in the deliberations carried not only the risks identified in the case law of dulled recollection and contamination, but also the risk of losing other jurors. The ten jurors who arrived on Thursday morning had already lost one morning while an eleventh juror dealt with her car problems. In the special circumstances presented here, there was good cause to dismiss the juror who was ill and resume deliberations.

■ The fact that defense counsel reached Juror 12 at her place of employment on October 24 does not alter the finding that there was good cause to excuse the juror on the afternoon of October 23. Good cause is determined by the information available to the Court at the time it makes its finding, not in hindsight.

*Conclusion*

The defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is denied. The defendant's request for a hearing is denied.

SO ORDERED.