**UNITED STATES of America,**

v.

**Andrey NEVSKY, Defendant.**

**No. 8:09–CR–301–7 (GLS).**

United States District Court, N.D. New York.

Jan. 18, 2011.

Richard S. Hartunian, United States Attorney, Of Counsel: Daniel C. Gardner, Assistant U.S. Attorney, Albany, NY, for The United States.

Office of Brian P. Barrett, Of Counsel: Brian P. Barrett, Esq., Lake Placid, NY, for Defendant.

## MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

### I. *Introduction*

Presumably pursuant to FED.R.CRIM.P. 33, Andrey Nevsky moves for a new trial following his conviction for conspiring to traffic marijuana.[1] (Dkt. No. 146.) He argues that the interests of justice require a new trial because: (1) the court violated his Fifth Amendment due process rights when it constructively amended the indictment by its jury instructions and verdict form; and (2) the government violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose a rental car document until the close of trial. The government opposes the motion. (Dkt. Nos. 150–51.) For the reasons that follow, the motion is denied.

### II. *Background*

#### A. *The Indictment*

Nevsky and fifteen others were indicted for various crimes related to a multi-million dollar marijuana importation and trafficking conspiracy involving the so-called "Sarti–Kener organization." (*See* 2d Superseding Indictment, Dkt. No. 33.) The organization conspired to smuggle marijuana into the United States from Canada, distribute it throughout the United States, and then smuggle the proceeds back into Canada. (*See id.*, Manner and Means, ¶ 2.) As to the marijuana trafficking, the indictment alleged that "sometime in and before about July 2007 . . . and continuing thereafter up to . . . June 10, 2009, . . . the Defendants . . . conspired . . . to possess with intent to distribute and to distribute a controlled substance, which offense involved more than 1,000 kilograms of marijuana."[2] (*See id.*, Count 1.)

#### B. *The Trial Evidence*

At trial, Nevsky conceded the existence, scope, and modus operandi of the Sarti–Kener marijuana trafficking conspiracy. (*See* Trial Tr. at 16–17, Dkt. No. 147.)[3] His concession was justified given the undisputed testimony of the organizations leaders (Steven Sarti and Edward Kener) and other coconspirators, and the corroborating testimony of the police.[4]

In summary, the evidence indisputably proved that from July 2007 through June 2009, Sarti and Kener managed a marijuana distribution organization that obtained

---

1. Nevsky cites only Rule 33. In passing, and without reference to Rule 29 or other authority, he mentions "entry of a judgment of acquittal." (*See* Nevsky Mem. at 1, Dkt. No. 146; *see also* FED.R.CRIM.P. 29.) In his argument, he fails to address the legal standards applicable to either. In any event, the court construes his submission as a Rule 33 motion seeking to vacate the verdict and grant a new trial.

2. While marijuana importation and distribution and money laundering were all integral parts of the same conspiratorial agreement, the indictment charged each as a separate conspiracy rather than as a single conspiracy with multiple target crimes. (*See* 2d Superseding Indictment, Counts 1–2, 4, Dkt. No. 33.) Because Nevsky was acquitted of the importation and money laundering conspiracies, his motion addresses only the marijuana distribution conspiracy.

3. The trial transcript is docketed as three volumes. (*See* Dkt. Nos. 147–49.)

4. The police corroborated various conspiratorial details through testimony about vehicle stops and seizures, residential seizures, physical surveillance, and electronic recordings of coconspirator conversations.

thousands of pounds of marijuana from Canadian suppliers, smuggled it across the Canadian–American border, distributed it to wholesalers throughout the United States, collected payment, and then smuggled a portion of the money back across the border to pay the suppliers.

The jury's conclusion that Nevsky was a participant in the conspiracy is fully supported by comparing the evidence of the organization's operational details and Nevsky's actions. As for the operational details, Sarti first obtained marijuana from Canadian sources, and then repackaged it in black hockey-style duffel bags, each containing one hundred pounds. He coded the bags according to quality and ultimate destination, and entered quantities and expenses in a journal. Thereafter, he managed numerous couriers and smugglers as they delivered the marijuana to, and across, the border. He often used Mohawk tribal members as smugglers because their Akwesasne Reservation occupies contiguous U.S. and Canadian territory free of strict police scrutiny. Once across the border, the marijuana was stored temporarily in trailers on or near tribal border property. Weekly, the organization moved as much as 2,000 pounds of marijuana across the border and into the storage trailers where fleets of couriers then transported it to various U.S. destinations. In fact, a Sarti drug ledger revealed that in one two-week period, the organization distributed 4,400 pounds of marijuana worth $10 million.

Sarti and Kener shared managerial responsibility for moving the marijuana from the temporary border facilities into the U.S. interior. Kener recruited fleets of couriers who traveled to the border storage facilities where they packed 200 pounds of marijuana (two hockey bags) in the trunks of large rented sedans, and subsequently proceeded south on Interstate 87 from the border to Albany. From Albany, they used the New York State Thruway as a conduit to their ultimate destinations. Sarti managed the couriers from Albany to the border and their subsequent return to Albany. Kener managed them thereafter. When the couriers delivered the marijuana to the wholesalers, they frequently received cash, which was then returned to Canada by reversing the operation.

Because the border and the northern stretches of Interstate 87 are desolate and subject to intense police scrutiny, the organization used various means to surreptitiously communicate and protect the drugs and cash. As marijuana moved south and cash north, the organization used couriers as blockers. Blockers positioned their cars in front of the load vehicle to scout for potential police interdiction. So too, blockers were positioned behind the load vehicle to divert the police by erratic driving maneuvers should there be an attempt to stop a load. Sarti trained the couriers and the blockers, and instructed them to have an excuse prepared if questioned by the police. For northbound couriers, one such excuse was to tell the police that they were going to the Reservation to play paintball.

Sarti also supplied the couriers with sophisticated Mag One radios to facilitate communications. Because the Mag Ones operated on a fixed frequency, they permitted secure communication in the rural areas. As to vehicles, Sarti and Kener trained the couriers to rent large sedans that would accommodate the marijuana hockey bags, and to obtain cars with New York plates to avoid police curiosity about out-of-state cars in rural New York. During a run, the couriers were trained to arrive at the storage sites the night before and sleep in the trailers. The following day, they retrieved multiple marijuana hockey bags from the trailers, assisted one another in loading the vehicles, and left in

blocker and courier convoys during less suspicious morning traffic.

Consistent with the organizations modus operandi, direct evidence amply demonstrated that Nevsky operated as a courier and blocker on three or four occasions before he was eventually stopped by the police during a money interdiction on January 21, 2008.

A Russian immigrant, Boston resident, and professional boxer, Nevsky was recruited by Kener—himself a native Russian—sometime during mid-to-late 2007. Shortly before January 21, Kener dispatched Nevsky to the border to retrieve a marijuana load. Nevsky rented a Chevy Impala with New York plates and drove to the Albany area where he rendezvoused with Sarti and others. On January 21, they proceeded north on Interstate 87 to a Burger King located at Exit 19. Once there, at least eight coconspirators converged in order to transport $500,000 in drug proceeds northward. Unbeknownst to the group, a long-time courier then cooperating with the police had disclosed the mission and was wearing a body recorder. Sarti directed Nevsky and others to serve as blockers for the load vehicle, and directed them north with Nevsky ahead of and others behind the load vehicle.

Ultimately, the load vehicle was stopped and the money seized. A short distance away, Nevsky was stopped by a New York State Police Officer, ostensibly for a traffic violation. He identified himself as a Bostonian, and told the Officer that he was on his way to the Akwesasne Reservation to play paintball, the excuse provided by Sarti during his training. The Officer saw Nevsky's car rental agreement and a Mag One radio on the front seat. During the stop, the Trooper noticed Nevsky's nervous behavior as Nevsky watched the load interdiction behind him. Nevsky was then permitted to leave. In a trailing car with the cooperating coconspirator, Sarti was recorded referring to Nevsky as a blocker. After the stop, Nevsky called Kener and asked to return to Boston. When Kener agreed, Nevsky did so, thereafter terminating his participation in the conspiracy.

Before the January 21 interdiction, Nevsky had been dispatched to the border to courier marijuana on at least three to four occasions. Each time, he personally transported 200 pounds of marijuana to some unidentified city. While retrieving the marijuana at the border, he stayed in the trailers with other couriers, he saw multiple hockey bags of marijuana stored there, and he assisted in loading courier vehicles. Each time he left the border, he drove south in a caravan with other couriers and blockers. Accordingly, there was ample evidence to support the jury's conclusion that Nevsky reasonably foresaw that the organization was distributing more than 1,000 kilograms or 2,200 pounds of marijuana. While Nevsky declined to testify at trial, his attorney raised a "mere presence" defense, arguing that Nevsky was not an intentional and knowledgeable conspiracy participant. (See, e.g., Trial Tr. at 16–26, Dkt. No. 147.) As Nevsky's agent, he admitted that Nevsky had made three to four trips to the border, including the January 21 trip. Ignoring his clients paintball explanation, he instead stated that Nevsky was a bodyguard for Sarti, who was an Akwesasne Casino gambler. He further admitted that Sarti had referred to Nevsky as a blocker during the January 21 conversation and that Nevsky had a Mag One radio in the car. He explained that the Mag One was supplied by Sarti in case he got lost. In summation, Nevsky's attorney again argued the "mere association" defense, pointing to the government's evidentiary failures, including its failure to produce any car rental records to corroborate Nevsky's participation. (See id. at 476, Dkt. No. 149.)

## C. Relevant Pretrial and Trial Proceedings

Before trial, Nevsky did not move to dismiss the indictment as either duplicitous or multiplicious. (*See* Dkt. No. 38; *see also* FED.R.CRIM.P. 12(b)(3)(B), (e) (providing that motions alleging indictment defects must be made before trial or are waived).)

In response to a pretrial order, the parties submitted proposed jury instructions and verdict forms. In his proposed instructions, Nevsky urged the court to charge that the marijuana conspiracy required a finding "[t]hat the object of the unlawful plan was to possess with intent to distribute and to distribute 1000 kilograms or more of marihuana." (Dkt. No. 97 at 7.)

At trial and during the final precharge conference, the court specifically informed the parties that it intended to incorporate a quantity instruction. (*See* Trial Tr. at 433–35, Dkt. No. 148.) Nevsky neither objected nor made an alternative request. (*See id.; see also* FED.R.CRIM.P. 30.) Furthermore, the verdict form was supplied to Nevsky in advance of his summation and before it was submitted to the jury, and he did not object. (*See* Trial Tr. at 433–35, 443–45, Dkt. Nos. 148–49.) The court instructed the jury regarding quantity in direct and supplemental instructions, and Nevsky did not object. (*See id.* at 516–18, 536–45.) The jury subsequently convicted Nevsky and found that 1,000 kilograms of marijuana was reasonably foreseeable by him. (*See id.* at 556.)

As to Nevsky's *Brady* claim, the government fully disclosed all documents in its file pertaining to Nevsky before trial, including 435 pages of discovery documents and a detailed letter reciting possible impeachment material related to its cooperating witnesses. (*See* Gardner Aff. ¶ 1, Dkt. No. 151; Gardner May 15, 2010 Letter, Dkt. No. 151:1.) On the first day of trial, the government electronically contacted car rental agencies seeking information concerning Nevsky. (*See* Gardner Aff. ¶ 2, Dkt. No. 151.) National Car Rental responded and electronically sent the government a contract indicating that Nevsky rented a vehicle for a two-day period, December 11 and 12, 2007. (*See* Dkt. No. 151:2.) Believing that the document was inculpatory but foundationally inadmissible, the government did not disclose it to defense counsel until the close of proof on the third day of trial. (*See* Gardner Aff. ¶ 3, Dkt. No. 151.) According to the rental document, and consistent with the organizations modus operandi, Nevsky rented a full-size sedan with New York plates. (*See* Dkt. No. 151:2.) Once Nevsky received the contract, he did not seek to reopen the proof and offer the document or recall Kener; nor did he bring the disclosure to the courts attention. In fact, he argued in summation that the lack of such a record demonstrated his innocence.

## III. Legal Discussion

### A. Standard of Review

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R.CRIM.P. 33. While the court may evaluate the weight of the evidence and the credibility of witnesses when considering a Rule 33 motion, it should reject the jury's credibility assessment only in "exceptional circumstances, such as when testimony is patently incredible or defies physical realities." *United States v. Sanchez,* 969 F.2d 1409, 1413–14 (2d Cir.1992); *see also United States v. Robinson,* 430 F.3d 537, 543 (2d Cir.2005). Thus, while the court has broad discretion to grant a new trial, it must exercise its authority "sparingly and in the most extraordinary circumstances." *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001) (internal quotation marks and citation omitted). By its terms, the

rule is designed "to avert a perceived miscarriage of justice." *Id.* at 133 (internal quotation marks and citation omitted). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir.2005) (internal quotation marks and citations omitted); *see also United States v. Boyd*, 401 Fed.Appx. 565, 565–66 (2d Cir.2010).

### B. *Constructive Amendment of the Indictment*

The gist of Nevsky's constructive amendment claim is that because the indictment charged him with a conspiracy to possess with an intent to distribute *and* distribution, the court constructively amended the indictment by substituting the word "or" in its instructions and verdict form. His argument finds no legal support and is rejected.

First, while Nevsky argues due process, a constructively amended indictment implicates the Fifth Amendments Grand Jury Clause. *See United States v. Soerbotten*, 398 Fed.Appx. 686, 687 (2d Cir.2010). While a constructive amendment is a per se violation of that Clause, *see United States v. Rigas*, 490 F.3d 208, 225–26 (2d Cir.2007), Nevsky "must demonstrate that ... the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003) (internal quotation marks and citations omitted). " 'Where charges are constructively narrowed or where a generally

framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment." *Id.* at 621 (quoting *United States v. Wallace*, 59 F.3d 333, 337 (2d Cir.1995)).

Although Nevsky's argument is difficult to decipher, he appears to misunderstand the fundamental distinction between drug conspiracies and underlying target offenses. As an initial matter, substantive drug offenses can be committed in various ways, all as set out in a single statute. *See* 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person ... to ... distribute, ... or possess with intent to ... distribute ... a controlled substance.") For example, and depending on the facts and the governments theory, a defendant can be convicted under the statute for possessing narcotics with the intent to distribute them, or for their actual distribution. *See id.* Unquestionably, the statute is constitutional and permits alternative bases for substantive § 841 convictions. *See, e.g., United States v. Gore*, 154 F.3d 34, 47 (2d Cir.1998).[5]

As to conspiracy, however, the sole crime is an illegal agreement which often has multiple target crimes that are carried out in furtherance of that agreement. *See United States v. Pressley*, 469 F.3d 63, 65 (2d Cir.2006). Furthermore, a drug conspirator is accountable for all drugs his coconspirators conspired to possess with the intent to distribute or distributed provided he knew of such activities or those activities were reasonably foreseeable by him. *See United States v. Robinson*, 313 Fed.Appx. 363, 364 (2d Cir.2008); *see also Pressley*, 469 F.3d at 66. Drug quantity is now an element to be determined by a properly instructed jury, and that is pre-

---

**5.** Undoubtedly, certain factual scenarios can raise issues of duplicity or merger or complications related to substance identification and quantity, but no such issues are extant in this case. *See, e.g., United States v. Zillgitt*, 286 F.3d 128, 137 (2d Cir.2002); *United States v. Sturdivant*, 244 F.3d 71, 75–76 (2d Cir.2001); *Gore*, 154 F.3d at 46–47.

cisely the charge Nevsky's jury received. *See United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003) (citing *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *United States v. Thomas,* 274 F.3d 655 (2d Cir.2001) (en banc)).

■ So too, even if a single conspiracy conjunctively charges multiple illegal goals but the jury charge is disjunctively delivered, there is no error as long as the conviction is supported by proof of any of the alleged goals. *See United States v. Thomas,* 54 F.3d 73, 81 (2d Cir.1995). Lastly, Nevsky never objected to the court's charge; nor did he make any effort to acquaint the court with the theory he now asserts.

■ In sum, the charge and verdict form did not constructively amend the indictment because the evidence overwhelmingly reflected Nevsky's conspiratorial agreement to distribute marijuana and possess it with the intent to distribute it. Accordingly, there was no violation of the Fifth Amendment's Grand Jury Clause and Nevsky's Rule 33 motion is denied.

## C. *Brady Violation*

■ Irrespective of good or bad faith, the Fifth Amendment's Due Process Clause requires government disclosure of favorable evidence that is material to either guilt or punishment or the impeachment of government witnesses.[6] *See United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Triumph Capital Group, Inc.,* 544 F.3d 149,

161 (2d Cir.2008); *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir.2001). However, there is no *Brady* violation absent "materiality," which requires that the government's non-disclosure is so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *See United States v. Jackson,* 345 F.3d 59, 73–74 (2d Cir.2003); *Coppa,* 267 F.3d at 140. Said otherwise, a violation occurs when the government suppresses evidence that "could reasonably have been taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Coppa,* 267 F.3d at 139 (internal quotation marks and citations omitted). While a defendant is not required to show that disclosure would have ultimately led to his acquittal, he must demonstrate from the entire record that the favorable evidence undermines confidence in the verdict. *See Triumph Capital Group, Inc.,* 544 F.3d at 161. Furthermore, the materiality inquiry may be influenced by whether the defendant or his attorney knew, or should have known, of the essential facts permitting him to take advantage of favorable evidence. *See Jackson,* 345 F.3d at 73; *see also United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993).

■ As for the timing of disclosure, *Brady* is satisfied as long as a defendant has the evidence in time for its effective use. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure would have produced a different result. *See Coppa,* 267 F.3d at 144; *Jackson,* 345 F.3d at 74.

■ In sum, to secure a new trial based on a *Brady* violation, Nevsky must demonstrate " 'a reasonable probability

**6.** All such evidence is commonly referred to as *"Brady* material," and the court adopts that label.

that, had [the suppressed information] been disclosed to the defense, the result of the proceeding would have been different.' " *United States v. Basciano*, 384 Fed.Appx. 28, 31 (2d Cir.2010) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Thus, reversal is required only if suppression "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006).

 Turning to the instant record, Nevsky's argument is illogical in light of his trial tactics. He argues that if he had the contract when cross-examining Kener, he could have challenged the credibility of Kener's assertion regarding Nevsky's involvement in the organization as early as July 2007. While Kener's testimony could be construed as suggesting such early involvement, Kener was by no means firm on that date. In any event, all other co-conspirators, including Sarti, placed Nevsky's involvement as beginning in late Fall or December 2007. More importantly, all witnesses agreed that Nevsky participated a total of three or four times and Nevsky admitted that participation in his opening statement. Given the testimony and Nevsky's concession, the length of his involvement is essentially irrelevant. The cogent proof of the number of times and the circumstances of his involvement amply supports the jury's conclusion that more than 1,000 kilograms of marijuana was reasonably foreseeable by him.

Furthermore, the court is hard pressed to understand how the contract would have aided Nevsky's cross-examination of Kener and furthered his defense. The contract was consistent with the government's proof; namely, Nevsky rented a full-size sedan with New York plates in December 2007 at Boston's Logan Airport. Given

Nevsky's concession concerning the number of trips, the contract corroborates the government witnesses. As to other trips, the contract had no evidentiary value.

It is also noteworthy that Nevsky never brought the contract to the courts attention when there was at least some opportunity to deal with his current arguments. He had not yet rested, and the court could have permitted him to recall Kener. So too, Nevsky presumably knew that such records existed since he negotiated the contract. Lastly, he used the absence of such records as a sword in his summation, arguing that the prosecution's failure to produce contracts was proof of his innocence. In the end, Nevsky's *Brady* claim fails since his trial defense conceded presence, but argued that mere presence was insufficient proof of participation in a conspiracy.

Given the court's analysis, it is highly questionable whether the National rental record constituted *Brady* material in the first place. Regardless, earlier disclosure would not have altered the jury's verdict. Since the court is fully satisfied that the verdict is supported by proof beyond a reasonable doubt, Nevsky's motion is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Nevsky's motion for a new trial (Dkt. No. 146) is **DENIED;** and it is further

**ORDERED** that the Clerk of the Court provide copies of this Memorandum–Decision Order to the parties.

**IT IS SO ORDERED.**